[Civ. No. 31043. Fourth Dist., Div. One. Dec. 3, 1984.]

SAN DIEGO NAVY FEDERAL CREDIT UNION et al.,
Plaintiffs and Respondents, v.
CUMIS INSURANCE SOCIETY, INC., Defendant and Appellant.

COUNSEL

Hardin, Cook, Loper, Engel & Bergez, Gennaro A. Filice III and Roberta E. Nalbandian for Defendants and Appellants.

Breidenbach, Swainston, Yokaitis & Crispo, W. F. Rylaarsdam, Jeanne E. Emrich, Bronson, Bronson & McKinnon, Paul H. Cyril, David W. Gordon, Ronald E. Mallen, Michael J. Brady, David R. Fuller and Raoul D. Kennedy, as Amici Curiae on behalf of Defendants and Appellants.

Saxon, Alt, Brewer & Kincannon and Mark A. Saxon for Plaintiffs and Respondents.

Leonard Sacks, Robert E. Cartwright, Harvey R. Levine, Wylie A. Aitken, Harlan Arnold, Glen T. Bashore, Ray Bourhis, Richard D. Bridgman, Edwin Train Caldwell, David S. Casey, Jr., Victoria De Goff, Douglas K. deVries, H. Grieg Fowler, Sanford M. Gage, Ian Herzog, G. Dana Hobart, Stanley K. Jacobs, John C. McCarthy, Timothy W. Peach, R. H. Sulnick, Arne Werchick and Stephen Zetterberg as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**GAMER, J.**[*]—Cumis Insurance Society, Inc. (Cumis) appeals a judgment requiring Cumis to pay the San Diego Navy Federal Credit Union (Credit Union), J. W. Jamieson and Larry R. Sharp (insureds) all reasonable past and future expenses of their independent counsel retained for the defense of a lawsuit filed against the insureds by Magdaline S. Eisenmann (Eisenmann action).[1]

The issue presented to this court by the appeal is whether an insurer is required to pay for independent counsel for an insured when the insurer provides its own counsel but reserves its right to assert noncoverage at a later date. We conclude under these circumstances there is a conflict of interest between the insurer and the insured, and therefore the insured has a right to independent counsel paid for by the insurer.

The Eisenmann action against the insureds seeks $750,000 general and $6.5 million punitive damages for tortious wrongful discharge, breach of the covenant of good faith and fair dealing, wrongful interference with and inducing breach of contract, breach of contract and intentional infliction of emotional distress. Under insurance policies issued by Cumis, the insureds tendered the defense of the Eisenmann action to Cumis. Cumis associate counsel Willis E. McAllister reviewed the complaint in the Eisenmann action and concluded Cumis had a duty to provide a defense to the insureds. McAllister selected and retained, at Cumis' expense, the San Diego law firm of Goebel & Monaghan to represent the interests of the insureds in the

---

[*]Assigned by the Chairperson of the Judicial Council.

[1]Magdaline S. Eisenmann v. San Diego Navy Federal Credit Union, et al., San Diego Superior Court case number 469823.

Eisenmann action. McAllister informed Goebel & Monaghan it was to represent the insureds as to all claims in the Eisenmann action, including the punitive damages claim. He also told Goebel & Monaghan Cumis was reserving its right to deny coverage at a later date and the insurance policies did not cover punitive damages.

McAllister sent Goebel & Monaghan copies of the insurance policies in effect and letters accepting the defense and reserving rights which were delivered to the insureds. McAllister never asked Goebel & Monaghan for an opinion whether coverage existed under the insurance policies, nor did Goebel & Monaghan give any coverage advice to either Cumis or the insureds.

McAllister believed if the Eisenmann action resulted in a finding of wilful conduct or an award of punitive damages, the Cumis policies did not provide coverage for those damages. Moreover, his view was if the Eisenmann action resulted in a finding of breach of contract as against any of the insureds, there might be no coverage under the relevant Cumis policies. Accordingly, on behalf of Cumis, McAllister notified each insured by letter Cumis was reserving its rights to disclaim coverage and denying any coverage for punitive damages.[2]

The Credit Union retained the San Diego law firm of Saxon, Alt & Brewer (independent counsel) to provide independent representation to protect the insureds' interests. Independent counsel notified Cumis it was retained to act as cocounsel with Goebel & Monaghan and presented Cumis a claim for its attorneys' fees and costs. McAllister was persuaded California law required Cumis to pay the fees, and he agreed to pay the fees and costs

---

[2]The reservation of rights letter explained: "Because of the nature of the case and the present lack of factual information relative to the allegations of the plaintiff, it is necessary for Cumis Insurance Society, Inc. to reserve its rights to disclaim coverage on the ground that the actions complained of by the plaintiff are not covered under the Directors and Officers Endorsement to the Cumis Discovery Bond, or any other coverage provided by Cumis to you. Cumis specifically denies any coverage for punitive damages in the above-mentioned legal action.

"On behalf of Cumis Insurance Society, Inc., we will conduct an investigation of this case, and provide the defense to you under a full reservation of the Society's rights. In addition, if Cumis settles the above-mentioned legal action, Cumis reserves its right to seek reimbursement from you for such settlement amount if noncoverage by Cumis is subsequently established. Such investigation, defense or settlement shall not prejudice the rights of Cumis Insurance Society, Inc. to disclaim coverage at a later date.

"Although Cumis is not now denying coverage, we are sending this Reservation of Rights letter to you so that we may proceed to investigate the case, defend you or arrange settlement of this suit pending a decision of whether or not the actions complained of by the plaintiff are covered by Cumis. In the meantime, your rights and interests are being protected as though coverage does extend to the fact situation involved."

incurred by independent counsel as cocounsel for the insureds. Cumis paid two separate invoices for legal services of independent counsel but additional invoices were not paid. After independent counsel sent a demand letter to Cumis and further discussed the matter with McAllister, McAllister sought a separate opinion on the question from Cumis' home office and asked Goebel & Monaghan if it felt there was a conflict of interest in representing the insureds such that Cumis would be required to pay the expenses of separate counsel. Goebel & Monaghan told McAllister it did not see a conflict of interest. Cumis' home office came to the same conclusion and McAllister notified independent counsel Cumis would pay no further invoices.

In the Eisenmann action settlement conference, the case did not settle after a demand within the Cumis policy limits. Cumis authorized Goebel & Monaghan to make an offer at the settlement conference but in an amount lower than Eisenmann's demand. Goebel & Monaghan did not contact the Credit Union before or during the settlement conference, but informed the Credit Union about the conference afterward.

In this action, the trial court ruled Cumis is required to pay for the insureds' hiring of independent counsel, rejecting Cumis' argument the court was bound by *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168], and reasoning: "1. *Gray* involved a question of the duty to defend in an assault and battery case rather than the extent and scope of that duty. The reasoning thus used to support *Gray* is not controlling, especially if it makes little sense.

"2. The reasoning of *Gray*, '[s]ince . . . the court in the third party suit does not adjudicate the issue of coverage the insurer's argument (as to a conflict of interest) collapses,' just does not stand scrutiny. What the defense attorney in the third party case does impacts the coverage case, in that, the questions of coverage depends [sic] on the development of facts in the third party case and their proper development is left to the attorney paid for by the Carrier. *Gray* recognized that a finding in the third party action would effect the issues of coverage in a subsequent case but analyzed the question from the point of view of the carrier. *Gray* recognized a possible conflict from the point of view of the insured in footnote 18, where it stated: 'In rare cases the issue of punitive damages or a special verdict might present a conflict of interest, but such possibility does not outweigh the advantages of the general rule. Even in such cases, however, the insurer will still be bound ethically and legally, to litigate in the interests of the insured.' Additionally, *Gray* was looking for a way to avoid a conflict of interest, to hold that it was excluding all other approaches just does not make common

sense." The court further explained its ruling: "The Carrier is required to hire independent counsel because an attorney in actual trial would be tempted to develop the facts to help his real client, the Carrier Company, as opposed to the Insured, for whom he will never likely work again. In such a case as this, the Insured is placed in an impossible position; on the one hand the Carrier says it will happily defend him and on the other it says it may dispute paying any judgment, but trust us. The dictum in *Gray* flies in the face of the reality of insurance defense work. Insurance companies hire relatively few lawyers and concentrate their business. A lawyer who does not look out for the Carrier's best interest might soon find himself out of work."

In the usual tripartite relationship existing between insurer, insured and counsel, there is a single, common interest shared among them. Dual representation by counsel is beneficial since the shared goal of minimizing or eliminating liability to a third party is the same. A different situation is presented, however, when some or all of the allegations in the complaint do not fall within the scope of coverage under the policy. In such a case, the standard practice of an insurer is to defend under a reservation of rights where the insurer promises to defend but states it may not indemnify the insured if liability is found. In this situation, there may be little commonality of interest.[3] Opposing poles of interest are represented on the one hand in the insurer's desire to establish in the third party suit the insured's "liability rested on intentional conduct" (*Gray, supra,* 65 Cal.2d 263, 279), and thus no coverage under the policy, and on the other hand in the insured's desire to "obtain a ruling . . . such liability emanated from the nonintentional conduct within his insurance coverage" (*ibid.*). ██ ██ ██ Although issues of coverage under the policy are not actually litigated in the third party suit, this does not detract from the force of these opposing interests as they operate on the attorney selected by the insurer, who has a dual

---

[3]See *Purdy* v. *Pacific Automobile Ins. Co.* (1984) 157 Cal.App.3d 59, 76 [203 Cal.Rptr. 524], which states in part: "[T]he 'triangular' aspect of the representation afforded the insured by the insurer's lawyers is described as a coalition for a common purpose, a favorable disposition of the claim—with the attorney owing duties to both clients. As a practical matter, however, there has been recognition that, in reality, the insurer's attorneys may have closer ties with the insurer and a more compelling interest in protecting the insurer's position, whether or not it coincides with what is best for the insured. [Citation.]

"The problem arises when the attorney knows, or should know, that a conflict has appeared between the insurer and the insured as to the most beneficial course of action indicated by the developing circumstances. It has long been the law in this state that when a conflict develops, the insurer cannot compel the insured to surrender control of the litigation, and must, if necessary, secure independent counsel for the insured, [citations] and, as was explained in *Previews, Inc.* v. *California Union Ins. Co.* (9th Cir. 1981) 640 F.2d 1026, 1028, the insurer's obligation [to defend, after the appearance of a conflict] 'extends to paying the reasonable value of legal services and costs performed by independent counsel selected by the insured.' [Citations.]"

agency status (see *Tomerlin* v. *Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 647 [39 Cal.Rptr. 731, 394 P.2d 571]).[4]

    Here, it is uncontested the basis for liability, if any, might rest on conduct excluded by the terms of the insurance policy. Goebel & Monaghan will have to make certain decisions at the trial of the Eisenmann action which may either benefit or harm the insureds. For example, it will have to seek or oppose special verdicts, the answers to which may benefit the insureds by finding nonexcluded conduct and harm either Cumis' position on coverage or the insureds by finding excluded conduct. These decisions are numerous and varied. Each time one of them must be made, the lawyer is placed in the dilemma of helping one of his clients concerning insurance coverage and harming the other.

The conflict may appear before trial. Goebel & Monaghan represented the insureds in the Eisenmann action settlement conference and the case did not settle although a demand was made within policy limits. Before and during the settlement conference, Goebel & Monaghan was in contact with Cumis but had no contact with the insureds about settlement until after the conference ended. The insureds then wrote a letter to counsel: "You should know that the Credit Union desires the lawsuit to be settled without trial. Our insurance coverages, duly paid and contracted for, are precisely for such cases and any settlement liability that may arise therefrom. Your confidence in the defensibility of the case is appreciated. Should trial prove you wrong, however, and the jury awards damages, the insurance may no longer cover the Credit Union's possible losses. As you know, such losses would considerably exceed any possible settlement amount. It is clear that trial in lieu of settlement in this case subjects the Credit Union to a considerably additional risk while possibly lowering or eliminating a claim payout by Cumis. Such is not the basic premise upon which we contracted for insurance with Cumis.

"I urge you to work for an appropriate settlement before trial in this case so that Cumis will have provided the risk protection for which the Credit Union has contracted."

---

[4]An attorney having dual agency status is subject to the rule a "[c]onflict of interest between jointly represented clients occurs whenever their common lawyer's representation of the one is rendered less effective by reason of his representation of the other" (*Spindle* v. *Chubb/Pacific Indemnity Group* (1979) 89 Cal.App.3d 706, 713 [152 Cal.Rptr. 776]). While it has been said a policy provision requiring the insured to permit the insurer to employ the attorney to defend the third party suit amounts to a consent in advance to the conflict of interest (see *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 146 [65 Cal.Rptr. 406, 28 A.L.R.3d 368]), where the insured affirmatively withdraws that consent by hiring independent counsel, no doubt motivated by the insurer's reservation of rights, any such consent may be deemed withdrawn (see *Employers' Fire Insurance Company* v. *Beals* (1968) 103 R.I. 623 [240 A.2d 397, 403]).

On the advisability of settlement, Goebel & Monaghan represented clients with conflicting interests (*Tomerlin* v. *Canadian Indemnity Co., supra,* 61 Cal.2d 638, 647). No matter how honest the intentions, counsel cannot discharge inconsistent duties.

The potential problems may develop during pretrial discovery which must go beyond simple preparation for a favorable verdict to develop alternate strategies minimizing exposure. Goebel & Monaghan was bound to investigate all conceivable bases on which liability might attach. These investigations and client communications may provide information relating directly to the coverage issue. Furthermore, counsel may form an opinion about the insureds' credibility. As between counsel's two clients, there is no confidentiality regarding communications intended to promote common goals (Evid. Code, § 962). But confidentiality is essential where communication can affect coverage. ■ ■■■ Thus, the lawyer is forced to walk an ethical tightrope, and not communicate relevant information which is beneficial to one or the other of his clients.[5]

The American Bar Association Code of Professional Responsibility (ABA Code), Ethical Consideration EC5-1 reads: "The professional judgment of a lawyer should be exercised, within the bounds of the new law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client."

ABA Code, Ethical Consideration EC5-15 states, in pertinent part: "If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in lit-

---

[5]The court in *Industrial Indem. Co.* v. *Great American Ins. Co.* (1977) 73 Cal.App.3d 529 at p. 536 in footnote 5 [140 Cal.Rptr. 806], cited *E. F. Hutton & Company* v. *Brown* (S.D. Tex. 1969) 305 F.Supp. 371, 393-394, on a related issue. The *Hutton* court stated: " '[T]he basis for the rule against representing conflicting interests is broader than the basis for the attorney-client evidentiary privilege [Bus. & Prof. Code, § 6068]. The evidentiary privilege and the ethical duty not to disclose confidences both arise from the need to encourage clients to disclose all possibly pertinent information to their attorneys, and both protect only the confidential information disclosed. The duty not to represent conflicting interests, on the other hand, is an outgrowth of the attorney-client relationship itself, which is confidential, or fiduciary, in a broader sense. Not only do clients at times disclose confidential information to their attorneys; they also repose confidence in them. The privilege is bottomed only on the first of these attributes, the conflicting-interests rule, on both.' (Fns. omitted. *Id.* at p. 394.)" (See also *Parsons* v. *Continental National American Group* (1976) 113 Ariz. 223 [550 P.2d 94, 98-99].)

igation multiple clients with differing interests, and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially."

The standard of care expressed in the ABA canons underscores the existing conflict.

Cumis contends *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, is controlling and asserts Cumis fully met its duty to defend when it retained counsel at its expense and instructed counsel to defend the insureds in the underlying action.

*Gray* dealt with an insurer's duty to defend in the face of a third party complaint against the insured alleging the insured caused intentional injury which by the policy's terms is not within its coverage. The insured, Gray, was sued on the basis he "wilfully, maliciously, brutally and intentionally assaulted" the third party who prayed for both actual and punitive damages. The insurer refused to defend and the third party action went to judgment against the insured for actual damages. Gray then sued the insurer for breach of its duty to defend. Holding the insurer breached its duty to defend and was liable for the amount of the judgment in the third party suit, plus costs, expenses and attorney's fees for defending that suit, the Supreme Court said, in part, the insurer "bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy" (*Gray, supra,* 65 Cal.2d 263, 276-277). *Gray* pointed out the third party suit did not necessarily mean a recovery by the third party would be outside the policy's coverage[6] and it emphasized this "potential" or "possibility" of coverage in concluding the insurer "should have defended because the loss could have fallen within that liability" (*id.* at p. 277).

The insurer argued it had no duty to defend because its interests and those of its insured were opposed. The insurer asserted, had it defended the third

---

[6]"Jones' [third party] complaint clearly presented the possibility that he might obtain damages that were covered by the indemnity provisions of the policy. Even conduct that is traditionally classified as 'intentional' or 'wilful' has been held to fall within indemnification coverage. [Fn. omitted.] Moreover, despite Jones' pleading of intentional and wilful conduct, he could have amended his complaint to allege merely negligent conduct. Further, plaintiff [Gray] might have been able to show that in physically defending himself, even if he exceeded the reasonable bounds of self-defense, he did not commit wilful and intended injury, but engaged only in nonintentional tortious conduct." (*Gray, supra,* 65 Cal.2d 263, 277.)

party suit, "it would have sought to establish either that the insured was free from any liability or that such liability rested on intentional conduct. The insured, of course, would also seek a verdict holding him not liable but, if found liable, would attempt to obtain a ruling that such liability emanated from the nonintentional conduct within his insurance coverage. Thus, defendant contends, an insurer, if obligated to defend in this situation, faces an insoluable ethical problem." (*Gray, supra,* 65 Cal.2d at pp. 278-279.)

The court rejected the argument. "Since, however, the court in the third party suit does not adjudicate the issue of coverage, the insurer's argument collapses. The only question there litigated is the insured's *liability.* The alleged victim does not concern himself with the theory of liability; he desires only the largest possible judgment. Similarly, the insured and insurer seek only to avoid, or at least to minimize, the judgment. As we have noted, modern procedural rules focus on whether, on a given set of facts, the plaintiff, regardless of the theory, may recover. Thus the question of whether or not the insured engaged in intentional conduct does not normally formulate an issue which is resolved in that litigation." (*Gray, supra,* 65 Cal.3d at p. 279; italics by the court.)

At the same time, however, the court recognized, in the footnote to this passage, "[i]n rare cases the issue of punitive damages or a special verdict might present a potential conflict of interests, but such a possibility does not outweigh the advantages of the general rule. Even in such cases, however, the insurer will still be bound, ethically and legally, to litigate in the interests of the insured." (*Gray, supra,* 65 Cal.2d at p. 279, fn. 18.)

*Gray* found the insurer's contractual duty to defend cannot be avoided by creating a conflict of interest. *Gray* is not controlling here because it does not address whether the scope of the duty to defend includes payment for the insured's independent counsel where a conflict of interest exists.

We find authority for that proposition in an earlier case, *Tomerlin* v. *Canadian Indemnity Co., supra,* 61 Cal.2d 638, which involved a coverage problem arising out of a third party complaint alleging conduct partially excluded under the policy. *Tomerlin* stated: "Similarly, in cases involving multiple claims against the insured, some of which fall within the policy coverage and some of which do not, the insurer may be subject to substantial temptation to shape its defense so as to place the risk of loss entirely upon the insured. . . .

"It is true, of course, that defendant's attorney owes to the insured a legal duty to defend in good faith, but as Professor Keeton points out 'On the

other hand [the] company has no duty to sacrifice its own interests when they conflict with those of the insured.' (Keeton, *Liability Insurance & Responsibility for Settlement, supra,* 67 Harv.L.Rev. 1136, 1170.)

"Customarily, insurers, in cases involving tort claims in excess of policy limits, notify the insured that he may employ his own attorney to participate in the defense. (*Id.* at p. 1169.) A like duty must arise in the instant case in which potential conflict stemmed not only from the multiple theories of the Villines complaint and the propriety of settlement, but from the total absence in defendant of any economic interest in the outcome of the suit." (*Tomerlin, supra,* 61 Cal.2d at p. 647.)

Thus, the California Supreme Court recognized where, as here, multiple theories of recovery are alleged and some theories involve uncovered conduct under the policy, a conflict of interest exists. *Tomerlin* concluded: "In actions in which . . . the insurer and insured have conflicting interests, the insurer may not compel the insured to surrender control of the litigation. [Citations.]" (*Tomerlin, supra,* 61 Cal.2d at p. 648.) Although *Tomerlin* did not expressly state the insurer had to pay for the insured's independent counsel under such circumstances, this is necessarily implicit in the decision. If the insurer must pay for the cost of defense and, when a conflict exists, the insured may have control of the defense if he wishes, it follows the insurer must pay for such defense conducted by independent counsel.

Other decisions following *Tomerlin* have developed its reasoning further. For example, *Industrial Indemnity Co.* v. *Great American Ins. Co., supra,* 73 Cal.App.3d 529, held a coverage dispute between insurer and insured, similar to that here, created a conflict of interest. In *Industrial,* an employee of one of the insured's subcontractors was killed on the job. The employee's heirs sued, among others, the insured, Tomei, and the city which had contracted to have the insured do the work. The insurance policy named the city as an additional insured but coverage applied to the city only if its negligence was secondary, passive and vicarious, i.e., only if it was not actively negligent. Tomei was fully covered under the policy. The insurer retained counsel to defend both Tomei and the city. In December 1970, about two months before trial, counsel acquired knowledge the city was actively negligent and, on the eve of trial, he sent a reservation of rights letter to the city and hired independent counsel to represent it. One day later, the case was settled with the insurer apportioning $100,000 of the liability to the city where coverage was in question, and only $62,000 to the fully insured Tomei. The city was never consulted about the insurer's apportionment. After the insurer paid the settlement, it sued the city and its

other insurer in declaratory relief for reimbursement, using the same counsel it had retained to defend the third party suit. The city did not respond directly but filed a cross-complaint alleging breach of the insurer's duty to defend as a result of the insurer's retaining one attorney with conflicting interests in the third party suit.

*Industrial* spoke of the conflicts of interest in the third party action as follows: "In the Sanchez [third party] action Runkle [counsel retained by insurer] had three clients: Industrial, Tomei and the City. We assume that there was no conflict between Industrial and Tomei, whose protection under the Industrial policy appears to have been as broad as its exposure to liability in the Sanchez action. There were, however, obvious conflicts between Industrial and the City, as well as between Tomei and the City. . . . The Industrial-City conflict arises from the simple fact that, as Industrial sees it, the City's coverage under the endorsements to the Tomei policy was not as broad as the City's exposure to the Sanchez heirs. Essentially, the less 'vicarious' the City's liability, if any, turned out to be, the less was the danger that the Industrial policy would cover.

". . . . . . . . . . . . . . . . . . . . . . . .

"That Runkle represented conflicting interests in the Sanchez action is now plain. (See Rules of Prof. Conduct, rule 5-102(B).) As far as the record shows, the consent of the City to Runkle's representation of conflicting interests was never obtained. (See *Lysick* v. *Walcom,* 258 Cal.App.2d 136, 147 . . . .) It may well be that the conflict was not apparent when Runkle assumed the defense of the Sanchez action. It must, however, have become obvious sometime before December 1970, when Industrial first asserted its position with respect to the City's coverage under its endorsements. Even then Runkle did not discontinue the relationship. (See *Ishmael* v. *Millington,* 241 Cal.App.2d 520, 526-527 . . . .)" (Fns. omitted; *Industrial Indemnity Co.* v. *Great American Ins. Co., supra,* 73 Cal.App.3d 529, 536-537.)

Although the issue before the court in *Industrial* pertained to the conflict of interest problem in the later action in which coverage was in issue, the court recognized retained counsel is bound to learn about coverage issues as he prepares the earlier suit (*Industrial, supra,* 73 Cal.App.3d at p. 535). A conflict arises once the insurer takes the view a coverage issue is present. In *Industrial,* the retained counsel's recently acquired knowledge of the City's active negligence, combined with its reservation of rights, made the conflict "obvious sometime before December 1970" (*Industrial, supra,* 73 Cal.App.3d at p. 537). Thus, *Industrial* recognizes a serious conflict of interest occurs when insurer's retained counsel obtains information bearing

directly on the issue of coverage during the course of preparation of the third party suit. There is no room under *Industrial* for labeling the conflict there described as merely a "potential" one.[7]

In *Executive Aviation, Inc.* v. *National Ins. Underwriters* (1971) 16 Cal.App.3d 799 [94 Cal.Rptr. 347], the same insurer-selected attorney represented the insurer in a property coverage action by the insured against the insurer and represented the insured and insurer in a third party suit against the insured. Both actions arose from the same accident, a plane crash during a flight where there was a question whether the plane was being used in "common carriage." If the plane was ultimately found to have been used in common carriage, there would be no coverage under the terms of the policy. The attorney defending the property damage action against the insurer on this basis would be operating directly against the insured's interest in obtaining coverage for the third party suit.

The appellate court stated: "A reasonable solution was proposed by the New York Court of Appeals in *Prashker* v. *United States Guarantee Company* (1956) 1 N.Y.2d 584 . . ., namely, that where a conflict of interest has arisen between an insurer and its insured, the attorney to defend the insured in the tort suit should be selected by the insured and the reasonable value of the professional services rendered assumed by the insurer. If the insured and the insurer are represented by two different attorneys, each of whom is pledged to promote and protect the prime interests of his client, adequate representation is guaranteed and the deleterious effect of the conflict of interest imposed on an attorney who attempts the difficult task of representing both parties is averted." (*Executive Aviation, supra,* 16 Cal.App.3d at p. 809.) The court concluded: "We hold, therefore, that in a conflict of interest situation, the insurer's desire to exclusively control the defense must yield to its obligation to defend its policy holder. Accordingly, the insurer's obligation to defend extends to paying the reasonable value of the legal services and costs performed by independent counsel, selected by the insured [citation] . . . . We conclude that the insured here is entitled to the reasonable value of the legal services rendered by its independent coun-

---

[7]Cumis makes a distinction between "potential" and "actual" conflicts of interest which is invalid and unworkable. Recognition of a conflict cannot wait until the moment a tactical decision must be made during trial. It would be unfair to the insured and generally unworkable to bring in counsel midstream during the course of trial expecting the new counsel to control the litigation. Contrary to Cumis' argument, the existence of a conflict of interest should be identified early in the proceedings so it can be treated effectively before prejudice has occurred to either party. It may well be in a given case special verdicts will not be requested or given, and other indicators on the basis of liability such as punitive damages will not come into play. Nevertheless, this often cannot be known until shortly before the case is submitted to the jury. By that time, it is normally too late to prevent prejudice.

sel and the costs in the Dakin action." (*Executive Aviation, supra,* 16 Cal.App.3d at p. 810.)

The conflict in *Executive Aviation* is no more "real and existing" than the conflict in Cumis' case. In both instances, the interests of insured and insurer diverge and conflict, differing only in degree of immediacy. The result of the existing conflict is the same in each instance.

In *Previews, Inc.* v. *California Union Ins. Co.* (9th Cir. 1981) 640 F.2d 1026, the Court of Appeals decided the insurer was required to pay for independent counsel due in part to a claim for punitive damages. The Court of Appeals said in applying California law: "This case presents a plain conflict of interest. . . . [The insurer's] best interests are served by a finding of willful conduct because it thus may not be deemed liable. Previews, on the other hand, could suffer greater loss by a finding of willful conduct because Previews would then be liable for punitive damages. Thus, the district court properly decided that Previews was entitled to engage outside counsel." (*Previews, supra,* 640 F.2d at p. 1028.)

The point *Previews* makes about the insurer's interests being served by a finding of wilful conduct and resultant punitive damages fully applies to this case. Cumis retained counsel for a third party suit, the Eisenmann action, in which punitive damages were sought with a potential result there would be no coverage under the policy. The "plain conflict of interest" language of *Previews,* applies equally to this aspect of the case. Entitlement to independent counsel paid for by the insurer under its duty to defend is an order *Previews* directly supports.[8]

---

[8]Cumis cites a recent Ninth Circuit case, *Zieman Mfg. Co.* v. *St. Paul Fire & Marine Ins. Co.* (9th Cir. 1983) 724 F.2d 1343, which summarily approved the district court's denial of fees for independent counsel. According to the decision of the district court approved by the Court of Appeals, the insured hired independent counsel after the third party amended his complaint to claim punitive damages and the insurer notified the insured there was no coverage for wilful actions. The insurer provided a defense to the third party suit.

Reviewing a summary judgment in favor of the insurer in the insured's action for breach of the duty to defend (and the implied covenant of good faith) the Court of Appeals sought only to determine whether any genuine issues of material fact existed (*Zieman, supra,* 724 F.2d at p. 1344). Doing so, the Court of Appeals gave the following analysis: "Zieman [insured] alleges that a conflict of interest arose when the punitive damage claim was filed in addition to the damage claim. Zieman characterizes this as a genuine issue of material fact; however, it fails to point to any facts in dispute relating to this issue. Nor does Zieman present any evidence that an actual conflict of interest existed which would prevent St. Paul's retained counsel from defending Zieman. St. Paul (by providing the legal services of Hillsinger and Costanza) fulfilled its contractual duty to defend Zieman on all claims against it." (*Zieman, supra,* 724 F.2d at pp. 1344-1345.)

It is apparent *Zieman's* dominant concern was whether an issue of material fact was present. The court said no to this question. It made no analysis of the presence or absence of a conflict of interest, merely pointing to the absence of any facts in dispute relating to

In *Purdy* v. *Pacific Automobile Insurance Co., supra,* 157 Cal.App.3d 59, the plaintiff offered to settle his third party action within policy limits under circumstances where counsel retained by the insurer knew an excess verdict was probable. The insurer refused the offer. The court stated retained counsel was in a conflict of interest situation and the insured had a right to independent counsel paid for by the insurer. Further, the court stated: "[T]he record discloses that Purdy had in fact employed independent counsel as of December 1972, prior to the last offer of settlement; and that counsel strongly urged settlement of the Partin suit. Pacific, however, retained control of the litigation—to Purdy's disadvantage. The fact that Purdy did have independent counsel at a crucial stage of the settlement negotiations undoubtedly explains why the causes of action against the lawyer defending herein were not refined to charges of failing to disclose a conflict between the insurer and the insured." (*Id.,* at p. 77.)

Other jurisdictions reach varying conclusions on the issue before us (see *Employers' Fire Insurance Company* v. *Beals, supra,* 240 A.2d 397, 404, and works cited).[9]

The lawyer's duties in the conflict of interest situation presented here are correlative to the insurer's contractual duty to pay for an independent lawyer

---

the conflict of interest issue and the absence of evidence of actual conflict of interest. It is apparent the Court of Appeals did not address the merits of the conflict of interest issue. Thus, *Zieman* does not represent a holding on the issue we consider. Moreover, to the extent *Zieman* could be read as deciding the issue we consider, it does not reflect California law.

[9]Among the cases from other jurisdictions which are generally supportive of the view we take are the following:

| | |
|---|---|
| Alaska | *Continental Ins. Co.* v. *Bayless & Roberts, Inc.* (Alaska 1980) 608 P.2d 281; |
| Ariz. | *Fulton* v. *Woodford* (1976) 26 Ariz.App. 17 [545 P.2d 979]; |
| Ill. | *Maryland Casualty Company* v. *Peppers* (1976) 64 Ill.2d 187 [355 N.E.2d 24, 30]; |
| Md. | *Southern Md. Agr. Ass'n* v. *Bituminous Cas. Corp.* (D.Md. 1982) 539 F.Supp. 1295; |
| Mass. | *Magoun* v. *Liberty Mutual Insurance Company* (1964) 346 Mass. 677 [195 N.E.2d 514, 519]; |
| N.Y. | *Prashker* v. *United States Guarantee Company* (1956) 1 N.Y.2d 584 [154 N.Y.S.2d 910, 136 N.E.2d 871]; and see *Utica Mutual Insurance Co.* v. *Cherry* (1974) 38 N.Y.2d 735 [381 N.Y.S.2d 40, 343 N.E.2d 758]; *Public Service Mutual Ins. Co.* v. *Goldfarb* (1981) 53 N.Y.2d 392 [442 N.Y.S.2d 422, 425 N.E.2d 810]; |
| R.I. | *Employers' Fire Insurance Company* v. *Beals, supra,* 240 A.2d 397; |
| Tex. | *Steel Erection Co.* v. *Travelers Indemnity Co.* (Tex.Civ.App. 1965) 392 S.W.2d 713; and see *Satterwhite* v. *Stolz* (1968) 79 N.M.320 [442 P.2d 810];. |

Jurisdictions ruling to the contrary include:

| | |
|---|---|
| Ohio | *Motorists Mutual Insurance Co.* v. *Trainor* (1973) 33 Ohio St.2d 41 [294 N.E.2d 874]; |
| Va. | *Norman* v. *Insurance Co. of North America* (1978) 218 Va. 718 [239 S.E.2d 902]. |

when it reserves its rights to deny coverage under the policy. California Rules of Professional Conduct rule 5-102(B) states: "A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned."

■ Counsel representing the insurer and the insured owes both a high duty of care (*Lysick* v. *Walcom, supra,* 258 Cal.App.2d 136, 146) and unswerving allegiance (*Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 715-716 [201 Cal.Rptr. 528]). ■ When two clients have diverging interests, counsel must disclose all facts and circumstances to both clients to enable them to make intelligent decisions regarding continuing representation (*Ishmael* v. *Millington* (1966) 241 Cal.App.2d 520, 528 [50 Cal.Rptr. 592]). The ABA Model Code EC 5-14, 5-15, 5-16 and 5-17 reinforce these constrictions, EC 5-16 stating in part: "[B]efore a lawyer may represent multiple clients he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent."

One commentator analyzing these Ethical Considerations concluded: "The emphasis of the . . . Rules suggests a functional means of resolving the conflicts which confront counsel hired by an insurer to defend its insured. The best course is for an attorney to beware of the potential for conflict at the outset. . . . Where a question exists as to whether an occurrence is within coverage, independent counsel representing the insured's interests is required. The insurer is contractually obligated to pay for insured's independent counsel." (Dondanville, *Defense Counsel Beware: The Perils of Conflicts of Interest* (1982) 26 Trial Law. Guide 408, 415.)

The Committee on Professional Responsibility of the State Bar of Louisiana reaches the same conclusion. "Under the circumstances presented, the Committee is of the opinion that it would be improper, with or without the consent of all parties concerned, for the same attorney to represent both the insurer and the insured.

"The Committee is compelled to this conclusion based upon its belief that once the insurer decides to assert a coverage defense, the same attorney may not represent both the insured and the insurer. Canon 5 and, to some extent, Canon 7, would militate against such dual representation. EC 5-1 provides that the attorney's professional judgment should be exercised 'solely for the benefit of his client and free of compromising influences and loyalties,' including 'interests of other clients.' EC 5-14 states that an attorney cannot represent two clients with 'conflicting, inconsistent, diverse,

or otherwise discordant' interests. And EC 5-15 indicates that counsel 'should resolve all doubts against the propriety of the representation.'

"The Committee feels that when coverage is disputed, the interests of the insured and the insurer are always divergent. The attorney should not be placed in the position of divided loyalties. Such an arrangement would be adverse to the best interests of the insured, the insurer, the attorney, and the profession." (Opn. No. 342, 22 La. Bar J. (July 1974).)

■ We conclude the Canons of Ethics impose upon lawyers hired by the insurer an obligation to explain to the insured and the insurer the full implications of joint representation in situations where the insurer has reserved its rights to deny coverage. If the insured does not give an informed consent to continued representation, counsel must cease to represent both. Moreover, in the absence of such consent, where there are divergent interests of the insured and the insurer brought about by the insurer's reservation of rights based on possible noncoverage under the insurance policy, the insurer must pay the reasonable cost for hiring independent counsel by the insured. The insurer may not compel the insured to surrender control of the litigation (*Tomerlin* v. *Canadian Indemnity Co., supra,* 61 Cal.2d 638, 648; and see *Nike, Inc.* v. *Atlantic Mut. Ins. Co.* (N.D.Cal. 1983) 578 F.Supp. 948, 949). Disregarding the common interests of both insured and insurer in finding total nonliability in the third party action, the remaining interests of the two diverge to such an extent as to create an actual, ethical conflict of interest warranting payment for the insureds' independent counsel.

Judgment affirmed.

Brown, P. J., and Staniforth, J., concurred.

A petition for a rehearing was denied December 20, 1984, and appellant's petition for a hearing by the Supreme Court was denied February 21, 1985. Broussard, J., and Lucas, J., were of the opinion that the petition should be granted.