Pursuant to Rule 18, A.R.App.P., this Court consented to answer the following question certified by the United States District Court for the Northern District of Alabama:
 "Whether, in a situation where (a) the insurer has a contractual duty to provide a defense for all covered claims asserted by a third party against the insured and (b) the insurer elects to provide such a defense under a 'reservation of rights' because some of the claims asserted (or damages demanded) against the insured are not covered by the indemnification portion of the policy, counsel retained by the insurer has such a conflict of interest that the insured is justified in engaging counsel of its choice, with said counsel's reasonable attorney's fees to be paid by the insurer and with said counsel having control over the defense of the litigation against the insured."
In its petition for certification, the district court included a thorough statement of the facts that also explains the procedural background of the case, which we set out in its entirety here:
"This case arises out of a dispute between an insured, L S Roofing Supply Company, Inc. (hereinafter 'L S Roofing'), and its insurer, St. Paul Fire Marine Insurance Company (hereinafter 'St. Paul'), involving a suit filed against L S Roofing in Alabama state court by Beaver Construction Company on August 13, 1985. (Beaver Construction Company v. TamkoAsphalt Products, Inc.; L S Roofing Supply Company, Inc., etal., CV-85-4998) (hereinafter 'The Beaver Construction litigation' or 'the underlying action'). *Page 1299 
L S Roofing is insured by St. Paul under certain insurance policies which purport to insure L S Roofing against claims resulting from bodily injury to others and from damage to the property of others. It also appears that L S Roofing was insured under umbrella liability policies with First State Insurance Company from February 1, 1983, to February 1, 1984, and with Safety Mutual Casualty Company from February 1, 1984, to February 1, 1985. Both of these umbrella policies provide essentially the same coverage as is provided under the St. Paul policy, and are excess insurance policies in the amount of $500,000.
"The policies of insurance issued by St. Paul to L S Roofing contain the customary provisions imposing upon St. Paul a duty to defend its insured. Policy number 601NB1187 (in effect from February 15, 1983, through February 15, 1984), under the heading 'Additional benefits,' states that:
 " 'We'll defend any suit brought against you for damages covered under this agreement, even if the suit is groundless or fraudulent. We have the right to investigate, negotiate and settle any suit or claim if that seems proper and wise. " 'We'll pay all costs of defending the suit, including interest on any judgment. But we won't defend a suit or pay any claim after the limits shown on page 1 of this agreement have been used up paying judgments or settlements.'
"(Insuring Agreement 36, 'Comprehensive General Liability Protection,' at page 2 of 4.) Policy number 601NB2965 (in effect from May 1, 1984, through March 1, 1985), and policy number 601NB3190 (in effect from March 1, 1985, through March 1, 1986), contain similar provisions. (A true and correct copy of the indemnification provisions of the applicable policy is attached hereto as Exhibit 'A,' for the Court's convenience.)
"Each St. Paul policy provides $500,000 maximum single limit coverage for property damage and personal injury or any combination thereof.
"The complaint in the underlying action states claims against L S Roofing and Tamko Asphalt Products, Inc. (hereinafter 'Tamko'), the manufacturer of the roofing materials which were purchased by the plaintiff and installed at Riverchase Garden Apartments. The roofing materials were sold to the plaintiff by L S Roofing and were not altered or modified prior to the sale.
"The complaint in the underlying action alleges that L S Roofing breached certain express and implied warranties and was guilty of fraudulent concealment in regard to the sale of the roofing materials. The complaint alleges that the roofing materials had a purchase price of approximately $27,000. Counts one through three of the complaint each demand $75,000 in compensatory damages for breach of warranty, while count four demands $500,000 in compensatory and punitive damages for the alleged fraudulent concealment.
"On October 1, 1985, the firm of Sirote, Permutt, Friend, Friedman, Held Apolinsky, P.C. (hereinafter 'Sirote, Permutt') filed a Motion to Dismiss in the underlying action on behalf of L S Roofing. Sirote, Permutt continued to be attorneys of record for L S Roofing since the filing of this Motion to Dismiss. On October 24, 1985, an Answer was filed on behalf of L S Roofing by Alan T. Rogers of the firm of Balch Bingham, the firm retained by St. Paul to defend L S Roofing. L S Roofing's Answer raised the defense of the running of the statute of limitations as to the warranty and fraudulent concealment claims. The Answer further denies that express or implied warranties were made as alleged by the plaintiff. In addition, L S Roofing's Answer denies that notice was given to L S Roofing by the plaintiff as required by law and, in general, the Answer denies responsibility of L S Roofing for any damages sustained by the plaintiff in the underlying action.
"On October 24, 1985, Balch Bingham, on behalf of L S Roofing, propounded Interrogatories to the plaintiff and filed a Request for Production of Documents relating to the transaction made the basis of the Beaver Construction litigation, as well as for documents relating to damages, *Page 1300 
costs, and expenditures allegedly incurred by the plaintiff and made the subject of the underlying action.
"On March 18, 1986, Balch Bingham, on behalf of L S Roofing, gave appropriate notice for the taking of the deposition of a representative of the plaintiff. A motion to permit inspection of the roofing material and the structures to which it was applied was filed by Balch Bingham, on behalf of L S [Roofing], on May 12, 1986.
"L S Roofing contends, with respect to the underlying action, that the roofing material was not defective and was of good and merchantable quality. L S Roofing further contends that it made no misrepresentation by concealment or otherwise with respect to the roofing material sold to the plaintiff and further contends that any injury and damage sustained by the plaintiff was caused by improper and negligent application of the roofing materials.
"Tamko Asphalt Products, the manufacturer of the roofing materials in question, contends that the materials were not defective and were of good and workmanlike quality and fit for the purposes for which they were manufactured. Tamko further contends that tests have been made of the roofing material which show that it was not defective and was of good and workmanlike quality.
"On October 7, 1985, St. Paul sent L S Roofing a letter in which St. Paul stated that it was reserving its rights to disclaim coverage with respect to certain of the claims in the underlying action under the policy issued to L S Roofing. In this 'reservation of rights' letter, St. Paul stated that the amount sued for by Beaver Construction exceeded the limits of liability under the St. Paul policies issued to L S Roofing. In addition, St. Paul's letter stated that the claims of fraudulent concealment would not be covered by said policies. The reservation of rights letter also stated that St. Paul was referring the defense of the underlying action to Alan Rogers of the law firm of Balch Bingham, 'who will protect your interests pursuant to the terms and conditions' of the insurance policy issued to L S Roofing by St. Paul. The letter of October 7, 1985, stated in part as follows:
 " 'It is also our understanding that you have obtained your own personal counsel to represent you in this matter. We ask that you make your attorneys aware that the amount the plaintiff is suing for is in excess of your policy limits.'
"Upon notice of St. Paul's reservation of rights letter, L 
S Roofing, through its own attorneys, made demand on the attorneys hired by St. Paul to allow L S Roofing to retain, at St. Paul's expense, 'independent counsel' (Sirote, Fermutt) and to allow said 'independent counsel' to control the underlying action.
"In response to the demand made by L S roofing through its personal attorneys, the firm of Balch Bingham advised Sirote, Permutt of St. Paul's position by a letter from Alan Rogers on November 19, 1985:
 " 'St. Paul will continue to retain this firm to provide a full defense for its insured in this lawsuit. As indicated before, we are quite willing to keep you informed of the progress of this litigation. If your firm wishes to take an active role in the litigation, your fees should be submitted to that person or company retaining your services. If you should have any questions, please do not hesitate to call. Meanwhile, I will continue to keep you advised.'
"Although St. Paul has not refused to permit the participation of counsel retained by L S Roofing, there is no dispute that St. Paul is demanding that the attorneys engaged by St. Paul on behalf of its insured retain control of the underlying litigation.
"Balch Bingham follows a general practice but has a continuing relationship with St. Paul and regularly represents St. Paul's insureds and, from time to time, represents St. Paul's interests in litigation. The attorneys retained by St. Paul are aware of the coverage problems and have knowledge of the contents of the October 7 reservation of rights letters. In addition, the fees of these attorneys are being paid directly by St. Paul. *Page 1301 
"On March 5, 1986, L S Roofing filed suit against St. Paul in the Circuit Court of Jefferson County, Alabama (CV-86-500-981-WAT). L S Roofing's complaint sought declaratory and other equitable relief and alleged that it was a conflict of interest for St. Paul's lawyers to continue to control the underlying action since said lawyers were retained by St. Paul and St. Paul has a direct pecuniary interest in having the litigation resolved in a manner which relieves St. Paul of any financial responsibility under the insurance policies it issued to L S Roofing. According to L S Roofing's complaint, since the suit filed by Beaver Construction involves claims for which St. Paul has expressly denied policy coverage, there is an inherent conflict between the interests of L S Roofing and the interests of St. Paul. L S Roofing alleges that, while both parties would best be served by a dismissal of all claims or a defendant's verdict, if these events do not occur it is to L S Roofing's best interests to have the underlying action resolved on those claims for which coverage exists, while it is to St. Paul's interests to have it resolved on claims outside the coverage of the insurance policies. L S Roofing further alleges that the inherent conflict between its interests and those of St. Paul means that the joint representation of L S Roofing and St. Paul by attorneys selected by St. Paul results in less effective representation than if L S Roofing is allowed to select independent counsel. L S Roofing's complaint contends that, in reality, St. Paul's lawyers will have closer ties to St. Paul than to L S Roofing and said attorneys will have a more compelling interest in protecting St. Paul's position, whether or not it coincides with what is best for L S Roofing. Finally, L S Roofing contends that if St. Paul elects to enter a reservation of rights based upon non-coverage of certain claims, then St. Paul's duty to defend under the policies of insurance issued by L S Roofing obligates St. Paul to pay the reasonable attorney's fees of independent counsel selected by L S Roofing, and that St. Paul cannot require L S to surrender control of the underlying action to attorneys selected by St. Paul.
"This declaratory judgment action does not allege that coverage under St. Paul policies applies to the claims based on fraudulent concealment and does not seek a resolution of any questions of coverage.
"On or about April 18, 1986, St. Paul filed a petition in federal court to remove the present action from Jefferson County Circuit Court to the United States District Court, Northern District of Alabama, Southern Division. The case was assigned to Honorable Sam C, Pointer, Jr., Chief Judge. On May 19, 1986, St. Paul filed an Answer to plaintiff's complaint. In its Answer, St. Paul denies that it directed L S Roofing to surrender control of the underlying litigation to the firm selected by St. Paul, and states that St. Paul actually 'invited participation in the case by attorneys of its insured's choice.' In addition St. Paul specifically denies that there is a conflict of interest arising out of St. Paul's reservation of rights and the defense of the underlying action by attorneys hired by St. Paul. The Answer of St. Paul further contends that L S Roofing's declaratory judgment action is prematurely filed since no 'true' conflict of interest has been shown to exist with respect to St. Paul's insured and the attorneys employed by St. Paul to defend the underlying action.
"Essentially, it is the plaintiff's position that, under the facts of this case, the representation of L S Roofing by attorneys employed by St. Paul creates an unavoidable and inherent conflict of interest, even though, to the knowledge of the plaintiff, there have not occurred any acts which would constitute an actual or objective conflict on the part of the lawyers hired by St. Paul. In other words, according to the plaintiff, the present case presents a presumptive conflict of interest although the lawyers hired by St. Paul may not have taken any action which would actually prejudice L S Roofing.
"It is the contention of St. Paul that there is no presumptive conflict of interest and that the underlying lawsuit has not developed in such a fashion as to present a *Page 1302 
conflict of interest. It is further contended by St. Paul that the attorneys employed by St. Paul have the legal obligation and duty to defendant [sic] St. Paul's insured according to the best interests of the insured, L S Roofing Supply Company, and there is not substantial evidence to indicate that the attorneys will act otherwise in the defense of the case."
The parties have extensively researched the question presented and have provided this Court with excellent briefs setting forth their respective analyses of the cases from other jurisdictions dealing with this question, as well as other authorities who have considered the question. L S Roofing strongly contends that, because St. Paul decided to defend the underlying action against L S Roofing under a reservation of rights, the attorneys retained by St. Paul to defend L S Roofing have such a conflict of interest that L S Roofing is entitled to have independent counsel of its choice to control its defense and to require St. Paul to pay such independent counsel's reasonable fees.
L S Roofing argues:
 "At least fifty different courts in a dozen jurisdictions have addressed this precise issue and '[v]irtually every court considering the question has held that the presence of a coverage issue presents a conflict sufficient to allow the insured to select his own defense counsel.' Berg, 'Losing Control of the Defense — The Insured's Right to Select His Own Counsel,' 26 For the Defense 10, 11 (July 1984)."
L S Roofing does a thorough job of analyzing many of the decisions from other jurisdictions which it concludes support its position. St. Paul, on the other hand, devotes much of its effort in its brief to distinguishing these cases from the present case. St. Paul also cites several decisions from other jurisdictions that it concludes support its position. One of the cases St. Paul relies upon is Tank v. State Farm Fire Casualty Co., 105 Wn.2d 381, 715 P.2d 1133 (1986).
In Tank, one of the issues presented concerned the "nature of an insurance Company's duty of good faith toward its insured when the Company defends under a reservation of rights." 715 P.2d at 1135. In that case, State Farm Fire Casualty Company ("State Farm") agreed to defend its insured, James Tank, in an action against him alleging an intentional tort; however, State Farm advised Tank that, if his acts were found to have been intentional, a specific provision of his policy excluded such acts from coverage, and State Farm reserved the right to contest coverage. Thereafter, State Farm retained counsel to represent its interests and retained separate counsel to represent Tank, although Tank had retained his own personal attorney as well.
The attorney retained by State Farm to defend Tank maintained contact with Tank, his personal attorney, and State Farm, providing each with a written evaluation of the case prior to trial. It is unclear from the court's opinion whether the attorney State Farm provided Tank actually controlled the defense of the suit or whether he was working along with the attorney that State Farm retained to represent its interests. It is clear, however, that Tank's personal lawyer had some input because the court noted that "[c]ounsel also informed all parties that settlement in the $3,000 to $5,000 range had been rejected by Tank's personal lawyer," although the court further noted that it was unclear from the record what the reason was for rejecting the settlement proposal. Id. Ultimately the case was not settled but was tried to the court, which found that Tank had intentionally assaulted the plaintiff and assessed damages and costs against Tank in the amount of $16,424.07.
State Farm refused to pay the judgment against Tank, whereupon Tank brought an action against State Farm alleging that it had breached its duty of good faith by failing to make reasonable efforts to settle the underlying suit. Tank further alleged that State Farm subordinated his interests to its own by structuring the defense so as to absolve State Farm of any liability to pay pursuant to the terms of Tank's policy. Summary judgment was granted in favor *Page 1303 
of State Farm, and the Washington Court of Appeals reversed. The Supreme Court of Washington reversed the judgment of the Court of Appeals.
In Tank, the Washington Supreme Court held that, due to the potential conflicts of interest inherent in an insurer's conducting a defense of its insured under a reservation of rights, the insurer has an enhanced obligation of good faith
toward its insured in conducting such a defense. In its opinion, from which we quote at length below, the court set forth specific criteria that the insurer must meet in order to fulfill this enhanced obligation of good faith:
 "This enhanced obligation is fulfilled by meeting specific criteria. First, the company must thoroughly investigate the cause of the insured's accident and the nature and severity of the plaintiffs injuries. Second, it must retain competent defense counsel for the insured. Both retained defense counsel and the insurer must understand that only the insured is the client. Third, the company has the responsibility for fully informing the insured not only of the reservation-of-rights defense itself, but of all developments relevant to his policy coverage and the progress of this lawsuit. Information regarding progress of the lawsuit includes disclosure of all settlement offers made by the company. Finally, an insurance company must refrain from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk.
 "In addition to the above specific criteria to be met by the company, defense counsel retained by insurers to defend insureds under a reservation of rights must meet distinct criteria as well. First, it is evident that such attorneys owe a duty of loyalty to their clients. Rules of Professional Conduct 5.4(c) prohibits a lawyer, employed by a party to represent a third party, from allowing the employer to influence his or her professional judgment. In a reservation-of-rights defense, RPC 5.4(c) demand that counsel understand that he or she represents only the insured, not the company.
As stated by the court in Van Dyke v. White, 55 Wn.2d 601, 613, 349 P.2d 430 (1960), '[t]he standards of the legal profession require undeviating fidelity of the lawyer to his client. No exceptions can be tolerated.' [See EC5-14, EC5-15, and DR5-105, Code of Professional Responsibility of the Alabama State Bar.]
 "Second, defense counsel owes a duty of full and ongoing disclosure to the insured. This duty of disclosure has three aspects. First, potential conflicts of interest between insurer and insured must be fully disclosed and resolved in favor of the insured. . . . Second, all information relevant to the insured's defense, including a realistic and periodic assessment of the insured's chances to win or lose the pending lawsuit, must be communicated to the insured. Finally, all offers of settlement must be disclosed to the insured as those offers are presented. In a reservation-of-rights defense, it is the insured who may pay any judgment or settlement. Therefore, it is the insured who must make the ultimate choice regarding settlement. In order to make an informed decision in this regard, the insured must be fully apprised of all activity involving settlement, whether the settlement offers or rejections come from the injured party or the insurance company.
". . .
 "In holding that insurers defending under a reservation of rights have an enhanced obligation to insureds, and in enumerating specific criteria which comprise that enhanced obligation, we do not propose to discourage reservation-of-rights defense. We recognize that such a defense usually provides a valuable service to the insured. However, if the outcome of the trial would determine whether coverage exists, and an attorney hired by the insurer conducts a defense while in close communication with the insurer, the defense itself should be closely scrutinized. This is especially true where, as here, the judgment resulted in no liability to the insurance company.
 "We also recognize that insurers, when faced with defending under a reservation of rights, are not without alternatives. *Page 1304 
They may sue for a declaratory judgment before they undertake a defense, to determine their liability. See, e.g., American Employer's Ins. Co. v. Crawford, 87 N.M. 375, 533 P.2d 1203 (1975). The company may also instruct an insured to pay for his own defense, reimbursing him for defense costs if the final judgment establishes the company's liability. See, e.g., Waite v. Aetna Cas. Sur. Co., 77 Wn.2d 850, 467 P.2d 847 (1970). In any event, the company must always give equal consideration in all matters to the well being of its insured. 'Good conscience and fair dealing [require] that the company pursue a course that [is] not advantageous to itself while disadvantageous to its policyholder; . . .' Van Dyke v. White, 55 Wn.2d 601, 611, 349 P.2d 430
(1960) (quoting Perkoski v. Wilson, 371 Pa. 553, 557, 92 A.2d 189 (1952))."
Emphasis added. 715 P.2d at 1137-39. After a consideration of the approach taken by the Supreme Court of Washington inTank, supra, in contrast to the authorities cited to us by L 
S Roofing, we are of the opinion that the Washington approach is the better solution to the problem posed by this case, and we adopt that view.
Those authorities cited by L S Roofing, which stand for the proposition that, in all cases where there is a reservation of rights, regardless of the actual circumstances of the defense provided by the insurer, the insured is entitled to defense counsel of its choice who shall control the defense, and whose reasonable fees the insurer is required to pay, in our view go too far.[1] The objective in a reservation-of-rights situation is to put in place a procedure by which the insured can be confident that his interests will not be compromised nor in any way subordinated to those of the insurer as a result of the defense he is required to accept under the contract of insurance. The standard set forth in Tank, supra, requiring an enhanced obligation of good faith coupled with the specific criteria that must be met by both the insurer as well as the defense counsel retained by the insurer, provides an adequate means for safeguarding the interests of the insured without, at the same time, engaging in the presumption that any and all defense counsel retained by the insurance industry to represent its insureds under a reservation of rights are conclusively unable to do so without consciously or unconsciously compromising the interests of the insureds.
Thus, we answer the certified question in the negative: The mere fact that the insurer chooses to defend its insured under a reservation of rights does not ipso facto constitute such a conflict of interest that the insured is entitled at the outset to engage defense counsel of its choice at the expense of the insurer. We hold that, if the insurer and the defense counsel retained by the insurer to represent its insured meet the specific criteria herein-above adopted, the insurer has met its enhanced obligation of good faith, and the defense provided by the insurer may proceed under a reservation of rights. It is only when those criteria have not been met in whole or in part that the insured is entitled to retain defense counsel of its choice at the expense of the insurer.
QUESTION ANSWERED.
All the Justices concur.
[1] E.g., Fireman's Fund Insurance v. Waste Management ofWisconsin, Inc., 777 F.2d 366 (7th Cir. 1985); Bogard v.Employers' Casualty Co., 164 Cal.App.3d 602, 210 Cal.Rptr. 578
(1985); Nandorf, Inc. v. CNA Ins. Companies, 134 Ill. App.3d 134, 88 Ill.Dec. 968, 479 N.E.2d 988 (1985); New York StateUrban Development Corp. v. V.S.L. Corp., 563 F. Supp. 187
(S.D.N.Y. 1983), aff'd, 738 F.2d 61 (2d Cir. 1984); San DiegoNavy Federal Credit Union v. Cumis Ins. Society, Inc.,162 Cal.App.3d 358, 208 Cal.Rptr. 494 (1984); Continental Ins. Co.v. Bayless Roberts, Inc., 608 P.2d 281 (Alaska 1980); UnitedStates Fidelity Guaranty Co. v. Louis A. Rosser Co.,585 F.2d 932 (8th Cir. 1978); Annot., 50 A.L.R. 4th 932 (1986); Berg, "Losing Control of the Defense — The Insured's Right to Select His Own Counsel," 26 For the Defense 10 (July 1984); Dodson, "Reservation of Rights by the Insurer and Rights of the Insured," 12 Colo. Law. 1974 (Dec. 1983); Morris, "Conflicts of Interest in Defending Under Liability Insurance Policies: A Proposed Solution," 1981 Utah L.Rev. 457 (1981). *Page 1305