**CARRIER EXPRESS, INC., Plaintiff,**

v.

**The HOME INDEMNITY COMPANY, Defendant.**

**Civ. A. No. 91–G–1072–S.**

United States District Court,
N.D. Alabama,
Southern Division.

June 3, 1994.

Douglas J. Centeno, Richard F. Ogle, Schoel, Ogle, Benton & Centeno, Birmingham, AL, for plaintiff.

Jasper P. Juliano, Parsons, Lee & Juliano, Birmingham, AL, for defendant.

### MEMORANDUM OPINION

GUIN, Senior District Judge.

This cause is before the court on three post-trial motions: 1) motion to alter or amend final order to include prejudgment interest filed by Carrier Express, Inc. (Carrier); 2) motion for judgment as a matter of law regarding the compensatory damages filed by Carrier; 3) motion for judgment as a matter of law; alternatively, motion for new trial; alternatively, motion for remittitur/motion to alter or amend the judgment filed by The Home Indemnity Company (Home). The merits of each motion will be addressed in this memorandum opinion, and the rulings of the court made.

This cause was tried before a jury for seventeen days. After due deliberation, the jury returned a verdict in favor of the plaintiff in the amount of $2,463,959.60 in compensatory damages and $4,812,500.00 in punitive damages. Carrier had sought $4,901,459.60 in compensatory damages. This sum represents $4,875,000.00, the amount above its insurance limits which Carrier was ultimately required to pay to settle the underlying suits from which this case sprang, and $26,459.60 in additional attorneys' fees incurred to protect its interests in the underlying cases.

### FACTS

Carrier is a Delaware corporation which operates as an interstate common carrier and broker in the contiguous United States. It is a wholly owned subsidiary of BethTran, Inc. which is a wholly owned subsidiary of Bethlehem Steel Corporation. Carrier has no employees as such, but it does have officers and directors. Carrier does not own any tractors or trailers. It leases tractors and trailers from other companies to haul steel. On November 16, 1987, Home issued a policy of trucker's insurance to Carrier. This policy had $1,000,000.00 per occurrence coverage limit.

On August 18, 1988, a multiple vehicle accident occurred on Interstate Highway 65 in Morgan County, Alabama. This accident resulted in five deaths and two serious personal injuries. The accident was a dramatic chain reaction collision involving several vehicles. These collisions resulted in fiery explosions which incinerated many of the crushed vehicles and their occupants.

One of the vehicles involved was a tractor trailer rig loaded with steel manufactured by Bethlehem Steel and loaded onto the truck at one of Bethlehem's manufacturing sites. Bethlehem employees participated in the loading of the steel coils onto the truck. Carrier was involved in the contract for hauling this load of steel. The nature of Carrier's role, whether broker or carrier, was a point of contention in the underlying litigation and will be discussed hereinafter. Bethlehem and Carrier were among the named defendants in the wrongful death and personal injury suits which resulted from this accident.[1] Suits were filed in both state circuit court and federal district court. These suits shall hereinafter be referred to as the underlying litigation, the underlying suits, or the underlying cases.

Carrier's policy with Home was in force at the time of the accident. Home undertook Carrier's defense on a reservation of rights basis. A letter dated February 10, 1989, was sent by Cindy Bastien, Home's claims service representative assigned to this matter, to James Matthews, Carrier's vice president of operations. In this letter Ms. Bastien stated, "We are assuming Carrier Express' defense, but we are reserving our rights to later disclaim any obligation under the policy and assert a defense of no coverage under the policy because Carrier Express was acting as a broker and not as a carrier in this transaction." Plaintiff's exhibit 11. A copy of this letter was sent to attorney Jack Hall, Jr., of the law firm of McDaniel, Hall, Conerly & Lusk, the law firm hired by Home to represent Carrier in the underlying suits. Jack Hall, Jr., and William McDaniel were the attorneys hired by Home to defend Carrier.

---

1. BethTran was also a named defendant in the underlying litigation, but it was dismissed from the suit on a motion for summary judgment. Its involvement in the underlying cases is not at issue in the case at bar.

McDaniel was the lead attorney. Despite the presence of the copy of this letter in his file, McDaniel repeatedly testified at the trial of the case at bar that he was unaware of the reservation of rights until his deposition was taken for use in the case at bar. Trial transcript, pages 2268–269 and 2278. Home ultimately withdrew its reservation of rights on November 14, 1990. Plaintiff's exhibit 79.

In February 1989, Home notified Carrier that the law firm of McDaniel, Hall, Conerly & Lusk had been retained to defend Carrier in the underlying suits. Jack Hall, Jr., and William McDaniel were counsel of record. Carrier was further notified of its right to retain independent counsel, because the damages claimed far exceeded the coverage provided by the policy. Agreed summary, pre-trial order entered April 26, 1993. Joseph O'Malley was general counsel for Carrier.

Bethlehem was represented in the underlying litigation by the law firm of Burr & Forman. Counsel of record were William Knight and Richard Freese. Bethlehem was also represented by Walter Morrissey, one of Bethlehem's in-house attorneys.

Early in the fall of 1989, the plaintiffs in the underlying litigation deposed Clifford Mundinger who was designated by Carrier as its corporate representative under Rule 30(b) of the Federal Rules of Civil Procedure. They also deposed Ricky Nelson Daniels, who was the driver of the truck hauling the steel coils, and Russell Siegel, the owner of the trucking company that provided the truck. Some of the testimony elicited in these depositions was detrimental to Carrier's position that it was merely a broker in the subject transaction, and that it, therefore, was not liable for any damages resulting from the August 18, 1988, accident.

On September 18, 1989, a letter written by Hall and signed by Hall and McDaniel was sent to Home summarizing the deposition testimony of Daniels, Siegel, and three other persons. It also gave a brief summary of Mundinger's testimony. The synopsis of Mundinger's testimony was that Mundinger would not testify that Carrier Express was not the carrier with respect to the load of steel involved in the accident. The letter states in part that:

We are preparing our motion for summary judgment in an attempt to get out of this case, *however, we do not feel that we will be successful* because the record has testimony which indicates Ricky Nelson Daniels is an agent for Carrier Express and that Carrier Express may have been the carrier as well as broker, in connection with the load transported by Siegel Transfer. . . . The plaintiff attorney believes he has established that Carrier Express, Inc. is the carrier and broker in connection with this load and there is testimony in the record by Clifford Mundinger, Russell Siegel, and Paul Marth (Bethlehem Steel representative) that Carrier Express, Inc. is the carrier in this case.

Plaintiff's exhibit 14 (emphasis added). No evidence was adduced at trial indicating that a copy of this letter was ever sent to Carrier. No notation of copies is present on the face of the letter. Carrier denies receiving a copy.

The evidence at trial showed that Bethlehem Steel was self insured for losses up to $10,000,000.00. It owned an umbrella policy which was triggered when the loss or claim of liability exceeded $10,000,000.00. This umbrella policy constitutes what is known in the insurance industry as an excess policy. For losses above the $10,000,000.00 trigger level, Bethlehem had layered coverage which consisted of several policies that provided coverage up to one hundred million dollars. Each policy covered a specific level of liability. As a Bethlehem subsidiary, Carrier was covered by these excess policies.

In the spring and early summer of 1990, Carrier, BethTran, and Bethlehem filed motions for summary judgment in the underlying cases. These motions were set for oral argument on August 31, 1990.

On June 25, 1990, with input from O'Malley, Walt Morrissey drafted a letter to Home requesting that Home tender the policy limits to the plaintiffs. O'Malley, after consulting with Carrier's president, Carl Eckenrode, had by that time asked Morrissey to work on behalf of Carrier in its efforts to settle the underlying litigation. The letter was on Carrier letterhead and was signed by Ecken-

rode. Plaintiff's exhibit 29. A copy was sent to Jack Hall, Jr. Home responded on July 2, 1990, saying that on the advice of counsel it did not wish to enter into settlement negotiations at that time. Home further stated that on the advice of counsel it would wait for the court's decision on Carrier's summary judgment motion prior to deciding how to proceed. Plaintiff's exhibit 34.

On July 16, 1990, David Marsh, attorney for one of the plaintiffs in the underlying litigation, made a written settlement demand on behalf of all plaintiffs for $3,150,000.00. Although the sum sought equalled the combined total of the defendants' primary insurance coverage limits, the demand did not expressly specify the source of payment or condition the offer on the funds coming from a particular source.[2] By its written terms, this demand was valid for seven days from the date of the letter. As events developed, the demand was orally amended to remain open until the date set for oral argument of Carrier's summary judgment motion. Although it was not required to contribute to the settlement, Bethlehem would have been released had the settlement been consummated.

At the time of the demand, all defendants with primary insurance coverage had tendered their limits, except Carrier and an individual defendant, Ferrell Winkler, who was insured by Harco National Insurance (Harco). Winkler was also a plaintiff with a personal injury claim in the underlying litigation. He was represented by attorney William Gantt in the defense of the claims against him. Gantt was retained by Harco to defend Winkler. Winkler was represented by the firm of Hogan, Smith & Alspaugh in his plaintiff's claim. Attorney of record was Ben Hogan. Winkler had $750,000.00 in primary insurance coverage. Harco continued to refuse to tender its limits until shortly before the trial date when the cases were ultimately settled. Mr. Gantt testified that Harco's refusal to tender was based on its concern that Winkler's plaintiff claim not be jeopardized. However, the court notes that the settlement demand made by the plaintiffs on July 16, 1990, specifically included Winkler's claim. Plaintiff's exhibit 38.

William Gantt further testified that Harco decided not to tender the limits on Winkler's policy until Bethlehem's summary judgment motion was ruled on. Trial transcript, page 2350. On July 23, 1990, Gantt sent a letter to Marsh which stated that due to the complexity of the case and Harco's ongoing evaluation of it, Harco could not respond to Marsh's settlement demand within the designated seven days. Plaintiff's exhibit 43. This information had obviously also been communicated to McDaniel and Hall. Included in their letter of July 20, 1990, to Home was a statement indicating that Harco was not going to make an offer at that time. Plaintiff's exhibit 42. Although the demand remained on the table for more than the designated seven days, Harco did not change its position while that demand was still open. Harco's position did not change until shortly before the December 3, 1990, trial date. Harco authorized the tender of $650,000.00 of the $750,000.00 coverage on November 12, 1990. Trial transcript, page 2403. It authorized the tender of the remaining $100,000.00 on November 30, 1990. Trial transcript, page 2405. Harco's agreement to tender came well after Bethlehem's summary judgment motion was entered on September 17, 1990, and well after plaintiffs' offer to settle for $3,150,000.00 had been withdrawn on August 31, 1990.

On July 25, 1990, Morrissey sent another letter to Home demanding that it tender its policy limits. As with the first letter, Morrissey had input from O'Malley, the letter was on Carrier's letterhead, and it was signed by Carrier's president, Carl Eckenrode. The letter clearly stated that Carrier did not deem Harco's failure to tender to be relevant to Carrier's need to tender its policy limits. The letter very specifically enumerated the enormous risks Carrier faced should

---

**2.** The demand did specifically state as a condition the payment of policy limits for underinsured motorist coverage in the Shearer and Walton cases. No evidence was adduced at trial to show that this condition in any way affected the decision making process of the primary insurers or created an impediment to settlement if an agreement could be reached for payment of $3,150,000.00. Accordingly, the court will treat this condition as extraneous to the issues at bar.

this settlement offer fall through. Copies of the letter were sent to both William McDaniel and Jack Hall, Jr. Plaintiff's exhibit 44.

On August 24, 1990, a third letter demanding tender was sent by Carrier to Home. The letter was produced in the same manner as the two preceding ones. This letter stated in part: "It is absolutely intolerable and improper for you to place Carrier Express in that jeopardy [exposing it to a possible ten to twenty million dollar verdict should the case go to trial]. You are playing with the ultimate financial solvency of Carrier Express. Carrier Express hereby demands that you tender the policy limits to plaintiffs in this matter on or before August 28, 1990." Copies of the letter were sent to both William McDaniel and Jack Hall, Jr. Plaintiff's exhibit 51. Additionally, on August 24, 1990, a letter was sent by Carrier directly to William McDaniel instructing him to make it clear to Home that policy limits should be tendered on or before August 28, 1990. This letter also explicitly stated; "We [Carrier] are your client. The insurance company is not." Plaintiff's exhibit 51.

The contemporaneous file notes made on August 28, 1990, by Cindy Bastien, the claims adjuster assigned by Home to the case, indicate that McDaniel had consistently advised Home to wait until the summary judgment was ruled on before considering tender of its limits. However, that day's notes indicate an impression on Bastien's part that McDaniel had suggested tendering prior to that ruling, trusting that Harco would not tender its limits. If Harco so refused, causing the settlement offer to fall through, and Home had so tendered, then as Bastien stated in her notes: "We'll [Home] have our cake and eat it too." Plaintiff's exhibit 139. However, Home did not at any time prior to the ruling on the summary judgment motion tender any amount in an effort to settle the underlying cases.

On August 27, 1990, Home hired attorney Jay Juliano to protect its interests in the event a bad faith claim was filed in regard to its handling of Carrier's defense in the underlying litigation. Juliano represents Home in the case now before the court.

On August 31, 1990, Bastien sent a letter to Carrier explaining in some detail why it would not tender any amount prior to the court's decision on the summary judgment motion. Home's rationale depended heavily on McDaniel's legal advice rendered throughout the course of the underlying litigation. It made clear that McDaniel had consistently advised Home not to tender its limits until after the motion for summary judgment was heard. Plaintiff's exhibit 53.

Arguments on the motions for summary judgment on behalf of Carrier and Bethlehem were heard on August 31, 1990. During the first week of September, McDaniel informed Bastien that he believed Carrier's motion for summary judgment would be denied. September 4, 1990, entry, Plaintiff's exhibit 139. The order and memorandum opinion ruling on the motion for summary judgment were entered on September 17, 1990. Carrier's motion for summary judgment regarding the breach of contract, negligent entrustment, and ultrahazardous activity claims was granted. Carrier's motion for summary judgment as to the vicarious liability/agency claims was denied. Bethlehem Steel's motion for summary judgment was denied as to the claims based on ultrahazardous activity, negligence, and wantonness. Bethlehem's motion for summary judgment was granted as to the claims based on vicarious liability.

Settlement conferences were held by the federal trial court in the federal underlying litigation on September 27, 1990, and October 8, 1990.[3] Plaintiffs' demand by the time of the first settlement conference had risen to $16,000,000.00. United States District Judge Edwin Nelson, the federal trial judge assigned to the cases filed in federal district court, estimated the cases' value to be between $15,000,000.00 and $20,000,000.00. United States District Judge Seybourn Lynne, who was called in to aid in the settlement process, evaluated the cases' value at $12,500,000.00. These estimates did not include the Pittman or Daniel death claims or

---

**3.** One case was filed and pending in the state court. The other six cases were filed in federal court and were pending before the Honorable Edwin Nelson of this court.

the Winkler personal injury claim. Defendant's exhibit 102. Home offered no money at the first conference. At the second conference, Home offered $225,000.00 through the McDaniel, Hall lawyers on behalf of Carrier. The plaintiffs rejected this offer. The cases in federal court had previously been set for trial on December 3, 1990. That setting remained in force following these unsuccessful settlement conferences.

On November 8, 1990, Carrier sent a letter to William McDaniel stating that his firm was being terminated as counsel for Carrier due to its handling of the underlying litigation. Plaintiff's exhibit 78. Carrier subsequently hired the firm of Bradley, Arant, Rose & White to represent it in these matters. John Morrow was the attorney of record. Home would not agree to terminating McDaniel and allowed him to continue representing the interests of Carrier for purposes of trying the underlying suits.

A few days prior to the trial date, Eckenrode authorized Morrissey to attempt to settle the cases for $5,000,000.00. On November 28, 1990, Eckenrode and Morrissey met with Bastien. In the course of this meeting, Carrier offered to resolve all disputes it had with Home if Home would agree to pay the $1,000,000.00 policy limit plus an additional $2,000,000.00 contribution toward settlement of the underlying cases. As part of the proffered agreement, Carrier would provide an additional $2,000,000.00 toward the settlement sum. Home declined the offer.

On November 29, 1990, Home authorized the payment of the $1,000,000.00 policy limits. On November 30, 1990, Morrissey (representing Carrier), Knight (representing Bethlehem), and David Marsh, counsel for plaintiffs in one of the federal cases, met to discuss settlement. These negotiations and others which followed with the other plaintiffs' counsel ultimately resulted in $8,025,000.00 in settlements, disposing of all the

cases, federal and state. This sum was $4,875,000.00 above the primary policy limits of the parties. All insurers agreed to pay their policy limits, totalling $3,150,000.00. Under the terms of the settlement agreement, Carrier was obligated to pay all sums above the primary policy limits. Bethlehem Steel was not obligated to contribute in any way. Carrier paid the $4,875,000.00 on December 18, 1990. In order to meet this obligation, Carrier paid $875,000.00 out of its own funds and borrowed the remainder from two of Bethlehem's other subsidiaries, Cambria & Indiana Railroad and Conemaugh & Black Lick Railroad. Carl Eckenrode is president of all three companies.

Carrier filed this suit against Home alleging negligent or bad faith refusal to settle on the part of its insurer, Home. Carrier's position statement, pretrial order. Carrier sought both compensatory and punitive damages.[4] As stated above this cause was tried before a jury for seventeen days. After due deliberation, the jury returned a verdict in favor of the plaintiff in the amount of $2,463,-959.60 in compensatory damages and $4,812,-500.00 in punitive damages. Carrier had sought $4,901,459.60 in compensatory damages. Of the sum claimed, $4,875,000.00 represents the amount which Carrier was ultimately required to pay to settle the underlying suits from which this case sprang, and $26,459.60 represents the additional attorneys' fees incurred by employing John Morrow of the Bradley, Arant firm to protect its interests in the underlying cases.

■ The court now has before it two motions for judgment as a matter of law, one filed by the defendant and one filed by the plaintiff. The United States Court of Appeals for the Eleventh Circuit has defined the applicable standard saying:

> [The court] consider[s] all the evidence, but all reasonable inferences must be drawn in the nonmovant's favor. If the

---

4. Home filed a declaratory judgment suit naming Bethlehem as the defendant and subsequently adding Carrier as a defendant as well. That suit was consolidated with the case at bar. In the case now before the court, Home filed a multi-count counter-claim against Carrier and added Bethlehem as a counterdefendant as well. The declaratory judgment action was decided in fa-

vor of Carrier and Bethlehem on motions for summary judgment. The summary judgment motions filed by Carrier and Bethlehem as to the counterclaim were granted in all aspects. Accordingly, only Carrier's claims of negligent or bad faith refusal to settle remained at issue for trial.

jury verdict is supported by substantial evidence—that is, enough evidence that reasonable minds could differ concerning material facts—the motion should be denied. A mere scintilla of evidence in the entire record, however, is insufficient to support a verdict.

*U.S. Anchor Mfg. Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 993 (11th Cir.1993), *petition for cert. filed* (May 6, 1994). However, the court is not to usurp the jury's function of weighing the evidence and making credibility determinations. *Walls v. Button Gwinnett Bancorp, Inc.*, 1 F.3d 1198, 1200 (11th Cir. 1993). The Eleventh Circuit has stated: "Neither the district courts nor the appellate courts are free to reweigh the evidence and substitute their judgment for that of the jury." *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1559 (11th Cir.1988). Following these standards, the court shall rule on the motions for judgment as a matter of law now before it.

*MOTION FOR JUDGMENT AS A MATTER OF LAW REGARDING COMPENSATORY DAMAGES FILED BY CARRIER*

■ Carrier has filed a motion for judgment as a matter of law in favor of the plaintiff in the amount of $4,875,000.00. This sum represents the amount Carrier had to pay in settlement of the underlying cases. Defendant contends that the record is devoid of evidence that Carrier paid more than its potential exposure in the underlying litigation by paying $4,875,000.00 to settle those cases. The jury had for its consideration an additional facet not encompassed in plaintiff's position. In addition to its consideration of Carrier's potential exposure, the jury also had to consider whether the settlement was made for Carrier's benefit or for Bethlehem's benefit, or for the benefit of both, and to what degree each benefitted.

The court charged the jury both as to potential exposure and as to the relative benefits inuring to Carrier and Bethlehem. The court stated in its charge to the jury that:

[L]iability exposure is what the parties or their attorneys perceive or see to be the potential outcome or result of litigation.

In considering financial exposure, they have a right to consider who would the plaintiff lawyers like to go after. [E]ven if you should find that Bethlehem escaped liability, although it should have paid a part of the settlement, if you should also find that Carrier Express still should have paid $5.875 million, then Home is not entitled to any reduction. If Carrier should have paid $5.875 million, it does not matter that Bethlehem Steel, in a properly structured settlement, possibly should have paid part of the difference between the total settlement of $8,025,000 and the amount paid by Carrier. The issue is whether or not, in a proper settlement made in good faith, Carrier Express should have paid $5.875 million in consideration of its own potential exposure.

Another way of saying that, it doesn't matter that Bethlehem in a properly structured settlement possibly conceivably should have paid part of the other [the $2.15 million paid by defendants other than Carrier] . . . that has nothing to do with this dispute. The dispute is whether they [Bethlehem] should have paid part of what Carrier paid, not part of what somebody else paid.

[I]f you find from a preponderance of the evidence that the $4.875 million, or a portion thereof, was a payment made by Carrier Express on behalf of Bethlehem Steel Corporation for the liability or liability exposure of Bethlehem Steel Corporation, then, to the extent of such payment on behalf of Bethlehem, Carrier cannot recover.

Trial transcript, pages 2757–58.

The jury obviously decided that the settlement was fifty percent for the benefit of Bethlehem. The compensatory award was exactly half of the $4,875,000.00 paid by Carrier plus the attorneys' fees generated when Carrier directly hired counsel to protect its interests in the last days of the underlying cases. While the jury could have come to the opposite conclusion or to a conclusion apportioning the benefits of the settlement differ-

ently, the conclusion it reached has ample evidentiary support.

The evidence showed that Walter Morrissey, in-house counsel for Bethlehem, was active in the settlement negotiations on behalf of Bethlehem from the outset and on behalf of Carrier in the later stages of the underlying litigation. The claims against Bethlehem based on ultrahazardous activity, negligence, and wantonness remained viable for trial, so Bethlehem faced significant potential exposure.

A series of letters from William Knight, the Birmingham attorney associated by Bethlehem in the underlying cases, to Walt Morrissey, Bethlehem's in-house counsel, was admitted into evidence in the case at bar. These letters make clear Bethlehem's extensive involvement and interest in the settlement negotiations and its assessment of its potential exposure. Defendant's exhibits 30, 47, 61, and 102. Knight's letter of December 14, 1990, gives an extensive summary of the course of events. This letter was in the nature of a congratulatory letter from Knight to Morrissey for a job well done in consummating the settlement in the underlying cases. As to Bethlehem's posture in the face of a jury trial, Knight states: "Since we believed from the outset any defendant that went to the jury would be found guilty and did not anticipate a jury spending any time trying to sort through the respective fault positions of each defendant, the prospects for a defense verdict were extremely doubtful. This was confirmed by our 3 mock juries."[5] Defendant's exhibit 102, page 2. The mock jury verdicts gave Knight his first indication that Bethlehem "could be facing a real runaway [adverse verdict] possibility." Defendant's exhibit 102, page 3.

Bethlehem was the most solvent defendant. The evidence adduced at trial indicated that none of the defendants other than Carrier and Bethlehem had appreciable assets beyond their insurance coverage amounts. In the face of a large verdict, the plaintiffs would have pursued Carrier and Bethlehem for the bulk of the verdict. The lead attorney for the plaintiffs in the underlying suits, David Marsh, testified in the case at bar that had the underlying cases gone to trial, he would have obtained a verdict against Bethlehem *inter alia.* He further testified that given the doctrine of joint and several liability applicable in Alabama, he would have pursued and collected the entire judgment from Bethlehem.[6] Trial transcript, page 2013. Dennis Pantazis, attorney for plaintiff estate of Bertie Pittman, testified that, in the face of a verdict against all defendants, he, too, would have pursued Bethlehem for the entire judgment beyond the sum covered by insurance policies. Trial transcript, page 2118–119.

If the underlying cases went to trial, an enormous verdict was almost a certainty. As discussed above, Judge Nelson had estimated the cases' value to be between fifteen and twenty million dollars. Judge Lynne had evaluated the cases' value at $12.5 million. The underlying suits were originally assigned to the undersigned, so the court is familiar with them. This court agrees with the high valuation of Judges Lynne and Nelson. As indicated by the excerpt from Knight's letter of December 14, 1990, Bethlehem's high level of exposure was obvious to Bethlehem throughout the course of the underlying litigation. It had a clear interest in settling the underlying suits in order to avoid putting its fate in the hands of a jury and, in all likelihood, becoming the target of all the plaintiffs' collection efforts for all amounts above the sum covered by the insurance policies of the other defendants.

The jury in the case at bar heard evidence regarding the facts of the underlying cases and the assessments by the judges and lawyers involved. As will be discussed at length below, it also heard evidence of the manner

---

5. In November 1990, counsel for Bethlehem hired a consulting firm to conduct mock trials of the underlying cases.

6. Under the doctrine of joint and several liability, a plaintiff who obtains a judgment against multiple defendants in a suit may seek to collect that judgment from any one or any combination of the defendants. In other words, any one of the defendants may have to pay all of the judgment or a disproportionate share of the judgment, because it is the only solvent or most solvent defendant. No contribution among joint tortfeasors can be claimed or required.

in which Home handled or mishandled the insurance aspect of those cases. The jury decided that Carrier was entitled to half the sum paid in settlement of the underlying cases plus the attorneys' fees it incurred in retaining counsel in the last stages of the underlying litigation.

The court shall not disturb the jury's award of compensatory damages. Accordingly, Carrier's motion for judgment as a matter of law in favor of the plaintiff in the amount of $4,875,000.00 is due to be denied. An order in conformity with this holding shall be entered contemporaneously herewith.

*MOTION FOR JUDGMENT AS A MATTER OF LAW; ALTERNATIVELY, MOTION FOR NEW TRIAL; ALTERNATIVELY, MOTION FOR REMITTITUR/MOTION TO ALTER OR AMEND THE JUDGMENT FILED BY THE HOME INDEMNITY COMPANY*

In preface to addressing the defendant's motion, the court must state that the evidence presented at trial regarding Home's misconduct was overwhelming. In more than forty-six years of experience at bench and bar, the court has never seen a more egregious example of bad faith than the one presented in this case. It was a textbook case of bad faith refusal to settle, an astonishingly complete catalogue of ways for an insurer to breach its duty to its insured. Only by attending the trial or by reading the entire trial transcript can one grasp the extensiveness and utter outrageousness of the wrongdoing on the part of Home. The jury listened attentively throughout the long days of the trial, conducted due deliberations, arrived at its findings of fact, and rendered its verdict upon the evidence heard. The court shall not disturb the jury's verdict.

By this motion, hereinafter referred to as defendant's motion for judgment as a matter of law, the defendant enumerates twenty-one grounds for the relief sought.[7] The grounds

may be grouped into several categories: broad, general averments that the verdict was contrary to law, against the great weight of evidence, and excessive (paragraphs 1–8); averments regarding the conduct of the jury during its deliberative process (paragraphs 9–12 and 19–20); an averment that substantial evidence was not adduced on the question of bad faith (paragraph 13); an averment of lack of legally competent evidence regarding the element of proximate cause as to negligent failure to settle and bad faith (paragraph 14); two assignments of error regarding the exclusion of evidence (paragraphs 17–18); and averments regarding the excessiveness and inappropriateness of the punitive damages award (paragraphs 15, 16, and 21).

### General Averments

Separate discussion of the broad, general averments is not necessary. They will be subsumed in the analysis of the more specific contentions. One basic position asserted by defendant, however, does bear separate mention at this point. The later discussion and findings by the court will further amplify the discussion here.

 The basic defense relied upon throughout the case at bar was that the settlement of the underlying cases was entirely for the benefit of Bethlehem Steel, and that Carrier had no reason to agree to pay the settlement amount above the policy limits other than to benefit Bethlehem Steel. The court finds the underlying premise of this defense to be patently absurd. As discussed below, Carrier had great reason to buy its peace in the way of the settlement it reached in the underlying cases. It had at risk its very financial existence. The jury found, and the court does not disagree, that the settlement was fifty percent for Carrier's benefit and fifty percent for Bethlehem's benefit. The causes remaining in the underlying cases against Bethlehem after resolution of the summary judgment motions, negligent loading and ultrahazardous activity, were not

---

**7.** The motion contains twenty-three numbered paragraphs. The final two paragraphs do not assert grounds as such. Paragraph twenty-two reasserts and adopts all objections, offers of proof, and other assignments of error made during the trial. Paragraph twenty-three reserves the right to supplement the motion as allowed by the Federal Rules of Civil Procedure.

strong. This court is not aware of any verdicts which have been rendered in Alabama in favor of a plaintiff in a negligent loading case, and, as a matter of law in Alabama, hauling steel coils on a tractor trailer truck has never been classified as an ultrahazardous activity. This court would hold that, as a matter of law, this activity is *not* ultrahazardous. As discussed below at some length, the claims against Carrier, on the other hand, were virtually assured of success. Carrier was in great peril of a financially disastrous verdict being rendered against it, being unable to make a supersedeas bond in the probable verdict amounts due to its relatively small net worth, and facing total destruction by the certain efforts to collect the verdict.[8] The jury found that Carrier had been responsible for $2,463,959.60 of the settlement payment in the underlying cases. This figure was within Carrier's net worth and ability to finance. It was a reasonable figure based on the evidence, and the court finds no reason to set it aside or alter it in any manner.

### *Jury Deliberations*

Defendant's contentions regarding the jury's deliberations are moot. The court has already issued its ruling on this point in its order and accompanying detailed memorandum opinion entered on March 4, 1994. As made clear in that memorandum opinion, such attacks on a jury's verdict are prohibited by Rule 606(b) of the Federal Rules of Evidence. Further, at defendant's request, the jury was polled immediately after the verdict was returned. Each juror replied affirmatively when asked if he or she agreed with the verdict. A copy of the court's memorandum opinion regarding this issue shall be appended hereto.

### *Exclusion of Evidence and Other Evidentiary Ruling*

■ Neither contention regarding exclusion of evidence has merit. In paragraph 17 of its motion now before the court, the defendant contends that its rights were substantially prejudiced by the court's precluding its expert witness Professor Robert Hamilton from testifying. The established practice of this court is to require the submission of detailed summaries of the testimony to be given by expert witnesses. Counsel are instructed by order of the court concerning the content and deadline for submission of these summaries. The summaries are to contain a clear statement of the substance of the expert's expected testimony. The expert's conclusions and the support for these conclusions must be included. This procedure was followed in this case. Professor Hamilton's expected testimony was a dissertation of the law as it related to this case. All topics addressed therein were pure questions of law. As such, this testimony was properly excluded. Decisions regarding questions of applicable law are the province of the court. The court instructs the jury regarding the applicable law; the witnesses do not.

■ In paragraph 18 of its motion, the defendant complains of the timing of leave by the court for the introduction of evidence concerning confusion in the underlying cases regarding the existence of insurance other than the primary policies. The court finds this contention to be totally without merit. The defendant obtained a favorable ruling from the court and chose not to present evidence on that point. Whether the timing of the ruling comported with the defendant's ideal trial strategy is not the issue. Such is not the stuff error is made of. Defendant was not foreclosed by the court from presenting this evidence. The defendant chose not to exercise the right given.

### *Proximate Cause*

■ The defendant argues that Carrier failed to meet its burden regarding proximate cause as to both its claims of bad faith and negligent failure to settle. In order to recover, Carrier had to prove by substantial evidence that Home had a duty to Carrier which it breached, thereby proximately or

---

**8.** The representation that Carrier had an approximate net value between $3,000,000.00 and $4,000,000.00 was repeatedly made to the court in various contexts off the record. This estimation was not disputed. The court's review of the record indicates that this information was not published to the jury during the course of the trial.

directly causing injury or damage to Carrier. The court charged the jury regarding proximate cause saying:

> Proximate cause of an injury is that cause which in the natural and probable sequence of events and without the intervention of any new or independent cause, produces the injury and without which such injury would not have occurred. It's sometimes defined as direct cause.
>
> It doesn't have to be the only cause. Sometimes in place of direct cause it's sufficient if the result were reasonably foreseeable. Certain wrongdoing would have a reasonably foreseeable result. Reasonable foreseeability or directness may not be the same thing, but they have the same legal quality. One may serve if the other is absent.

Trial transcript, page 2734.

Home contends its conduct did not cause the settlement effort in the underlying cases made in July 1990 to fail. Accordingly, it says that its conduct did not proximately cause Carrier's having to pay $4,875,000.00 above its insurance limits to settle the underlying suits. Home argues that, regardless of its conduct, the underlying cases would not have settled in July 1990 or at any time prior to the hearing on the summary judgment motions due to Harco's refusal to tender its limits. The great weight of the evidence led to the opposite conclusion, and the jury so found.

In the case at bar, the expert testimony offered by the plaintiff was devastating to the defendant's argument that the element of proximate cause had not been established. Both Alan Windt and Professor Karon Bowdre testified as to the usual conduct of insurers in multiple defendant clear liability litigation such as the underlying suits. The burden of proof to be carried by the plaintiff is to show what would have more likely than not occurred had Home offered its limits. Both Windt and Bowdre testified that typi-cally when all but one insurer tendered limits then that lone remaining insurer would more likely than not capitulate and tender its limits as well, thereby allowing the settlement to be consummated. This testimony came in without objection by Home; It was not objectionable in any event. Further, attorneys Knight, Morrow, Wood, Pantazis, and Marsh testified that such capitulation by the lone hold-out insurer was their professional experience as well. In her video deposition testimony Cindy Bastien, Home's own claims service representative assigned to the underlying cases, admitted that it had been her experience that an insurer in a multiple defendant case would cave in and tender when it was the only one refusing to tender in the face of a settlement offer. Transcript of video deposition of Cindy Bastien, pages 160–61.[9]

William Gantt, attorney for Harco, testified that in April 1990 he informed Harco and the other attorneys in the underlying cases that settlement of the claims against Winkler would require payment of Harco's policy limits, "if and when they (Harco) wanted to settle it." Trial transcript, pages 2407 (source of quoted material); also see trial transcript page 2405. On July 23, 1990, Gantt sent a letter to Marsh which stated that due to the complexity of the case and Harco's ongoing evaluation of it, Harco could not respond to Marsh's settlement offer within the designated seven days. Plaintiff's exhibit 43. Gantt testified that he would not have changed his recommendation against tender in the summer of 1990 even had Carrier tendered its limits at that time. Trial transcript, page 2353. He could not testify as to Harco's position had this event occurred, because this situation was never presented to Harco. Also, Gantt was not the decision maker for Harco; Winkler was his client, not Harco.

Gantt's testimony also revealed that he had formerly been associated with the McDaniel, Hall law firm. Trial transcript,

---

**9.** The video deposition was played for the jury at trial and was admitted in lieu of live testimony at the trial. The pertinent excerpt from the deposition reads:

Q. Did you have any experience with any such cases where after all but one of the defen-dants offered money, that the reluctant or the unwilling defendant came forward with money offered to settle the case? [Objection made]

Q. Do you understand my question?

A. Yes. Yes, I agree with what you said.

page 2337. It also showed that Gantt and his current firm had represented and still represented The Home Indemnity Company and The Home Insurance Company (parent corporation of The Home Indemnity Company, defendant in the case at bar). Trial transcript, pages 2397–99. The evidence adduced at trial showed that Winkler's potential liability in the underlying cases did not change between summer 1990 when the settlement offer was viable and November 1990 when the limits were finally offered and the settlement consummated.

The plaintiff further presented evidence that if Harco's failure to tender was the last remaining obstacle to the July 1990 settlement then Carrier was prepared to contribute the amount of Winkler's coverage ($750,000.00) in order to consummate the settlement. The deposition testimony of Walt Morrissey read into the record stated: "On a contingency basis, we discussed, well, what if some if not all of that is done [tender of policy limits by all defendants], and we were prepared, Carrier Express was prepared to fund a shortfall with its own money if it were necessary. I didn't believe that would ever be necessary, but it had been discussed." Deposition of Walt Morrissey, page 173. Trial transcript, page 2472–473. This testimony was undisputed. This approach was a sound business decision by Carrier intended to save the company from the potential disaster of a multi-million dollar verdict which would destroy the company entirely. The court, and evidently the jury as well, found this testimony believable. The defendant attempts to make an issue of the fact that Carrier did not inform Home of its intention to make up this shortfall. Carrier had no duty to so inform Home, nor did this business decision have any mitigating impact upon Home's duty to Carrier.

Defendant argues that the settlement would not have been consummated under these circumstances, because plaintiffs' attorneys would have had an obligation to pursue the additional insurance money. Attorney for the estate of Bertie Pittman, Dennis Pantazis, testified that the cases would not have settled had Carrier made up this shortfall rather than Harco's having tendered the policy amounts. He said his client's instructions to him were to pursue a policy limits settlement. Trial transcript, page 2101. David Marsh, lead attorney for plaintiffs in the underlying cases, testified that he could not say what the outcome would have been had Harco failed to tender and Carrier made up the shortfall. He further testified that his settlement demand was a policy limits demand. Trial transcript, page 2010. The court notes, however, that the written July 1990 settlement offer was in no way contingent on the source for the settlement funds. Had $3,150,000.00 been tendered, the plaintiffs in the underlying suits would have been bound by the written terms of their offer to accept the amount agreed upon, regardless of source.

■ The jury heard all of the testimony and reviewed all of the exhibits. In keeping with its function as the finder of fact, it drew its own conclusions as to credibility and found the evidence proffered by Carrier to be the more believable as to proximate cause and the injury resulting therefrom. The evidence at trial amply supports this finding. Competent expert and fact testimony supports the jury's finding that Home's refusal to tender the policy limits in the summer of 1990 proximately caused Carrier to have to pay far in excess of its policy limits to ultimately settle the underlying suits. It is not the province of the court to substitute its judgment for the credibility choices made by the jury. *Walls v. Button Gwinnett Bancorp, Inc.,* 1 F.3d 1198, 1201 (11th Cir.1993).

*Bad Faith*

■ The defendant contends that "there was no substantial evidence adduced which proved the necessary elements of bad faith." Defendant's motion for judgment as a matter of law, paragraph 13. The court finds this contention amazing in the face of the record.

■ The law imposes a duty on an insurer to act honestly and in good faith in its dealings with its insured. This duty of good faith encompasses a duty to use ordinary care and prudence in evaluating and acting upon settlement opportunities that arise in the context of lawsuits against the insured. If the insurer fails to exercise such

reasonable or ordinary care, then it has breached its duty and is guilty of negligence. The plaintiff alleged both negligent and bad faith failure to settle. The court's charge to the jury gives a good synopsis of the standards applicable to negligence and to bad faith. The court stated:

[N]egligence is the failure to do what a reasonably prudent insurance company would have done under the same or similar circumstances or the doing of something which a reasonably prudent insurance company would not have done under the same or similar circumstances....

A decision not to settle by an insurance company must be a thoroughly honest, intelligent, and objective decision. It must also be a realistic one when tested by the necessarily assumed expertise of the insurance company.

Jury charge, trial transcript, page 2737.

Bad faith is more culpable conduct than negligent conduct. As the court instructed the jury:

Bad faith embraces more than bad judgment or negligence and imports dishonest purpose, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. However, bad faith is not the equivalent of fraud and actual fraud need not be proven by the plaintiff in order to prevail on its claim against the defendant on bad faith.

Trial transcript, page 2749.

 Whether the defendant acted in bad faith is a question of fact for the jury to decide. The court instructed the jury as to the factors it was to consider in making this decision. Of course, many of these factors are interrelated, and analysis of one may touch or intertwine with the analysis of others. The court indicated to the jury in its charge that the pertinent queries include, but are not necessarily limited to:

(1) Was there a full investigation of the facts of the case?

(2) Was there an incompetent or dishonest evaluation of the underlying case?

(3) Did Home properly analyze the strength of its insured's position in the underlying cases from both a liability and damages standpoint? ...

(4) In deciding not to enter into settlement negotiations before the summary judgment hearing, did Home place its interests ahead of the interests of Carrier Express?

(5) Was the refusal of Home to settle related in any way to the existence of reinsurance? .... In this case, the evidence shows that Home did reinsure the second $500,000 of the million dollars of coverage.

But the question is not whether they had it, but whether the refusal to settle related in any way to the existence of reinsurance.

(6) Did Home establish appropriate reserves to settle the case?

(7) Did Home, (a) fail to respond to settlement offers, or (b) delay responding to settlement offers, or (c) fail to explore settlement possibilities when it would have been prudent to do so? In this regard, you should keep in mind that a settlement offer within policy limits is not necessarily a prerequisite to recovery in a bad faith failure to settle case.

(8) Was there an opportunity to settle the case within policy limits?

(9) Did the insured, here Carrier Express, request settlement within the policy limits? It's not necessary that such a request be made for liability to attach, but it is a factor to be considered, ...

(10) Did Home fail to keep the insured advised of relevant facts and developments?

(11) Was the amount of risk to the insured, Carrier Express, if the case was not settled, disproportionately large when compared to the risk to the insurer, Home?

(12) Did Home heed or listen to or take its own counsel's advice?

(13) Did Home act in an arbitrary, inflexible manner, indifferent to the consequences to the insured?

(14) Did Home properly react to adverse developments?

(15) Was Home negligent? Although inadequate by itself to prove bad faith,

evidence of the insurer's negligence, in failing to settle the case may be considered by you in determining the issue of bad faith.

(16) Did Home request some third party to contribute to the settlement before it offered its own policy limits?

(17) Was Home defending the plaintiff under a reservation of rights? That is not in dispute [in this case].

(18) Any other factors tending to establish or disprove bad faith or negligence on the part of the insurer.

Trial transcript, pages 2739–41.

■ In the case at bar, no dispute exists that the defense of Carrier was provided by Home under a reservation of rights. The duty of good faith owed by the insurer to its insured is heightened or enhanced when the insurer is providing a defense to its insured under a reservation of rights. Quoting from and adopting the language and holdings of *Tank v. State Farm Fire & Casualty Co.*, 105 Wash.2d 381, 715 P.2d 1133 (1986), the Alabama Supreme Court has stated:

This enhanced obligation is fulfilled by meeting specific criteria. First, the company must thoroughly investigate the cause of the insured's accident and the nature and severity of the plaintiff's injuries. Second, it must retain competent defense counsel for the insured. Both the retained defense counsel and the insurer must understand that only the insured is the client. Third, the [insurance] company has the responsibility for fully informing the insured not only of the reservation-of-rights defense itself, but of all developments relevant to his policy coverage and the progress of this lawsuit.... Finally, an insurance company must refrain from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk.

*L & S Roofing Supply Company, Inc. v. St. Paul Fire and Marine Insurance Company*, 521 So.2d 1298, 1303 (Ala.1987) (emphasis in original deleted).

Again adopting the language and holdings in *Tank*, the Alabama Supreme Court in *L & S Roofing* defined the standard of conduct for attorneys retained to represent the insured under a reservation of rights. The court stated:

In addition to the above specific criteria to be met by the [insurance] company, defense counsel retained by insurers to defend insureds under a reservation of rights must meet distinct criteria as well. First, it is evident that such attorneys owe a duty of loyalty to their clients.... *In a reservation-of-rights defense, RPC 5.4(c) [Rules of Professional Conduct] demand that counsel understand that he or she represents only the insured, not the company....*

*Second, defense counsel owes a duty of full and ongoing disclosure to the insured....* Finally, all offers of settlement must be disclosed to the insured as those offers are presented. *In a reservation-of-rights defense, it is the insured who may pay any judgment or settlement. Therefore, it is the insured who must make the ultimate choice regarding settlement.*

*L & S Roofing Supply Company, Inc. v. St. Paul Fire and Marine Insurance Company*, 521 So.2d 1298, 1303 (Ala.1987) (emphasis in the original).

■ If the jury finds by a preponderance of the evidence that the defendant was negligent or acted in bad faith in its failure to settle, the jury may award compensatory damages. If the jury finds by clear and convincing evidence that the defendant was guilty of bad faith and that "the defendant consciously or deliberately engaged in oppression or wantonness or malice with regard to the plaintiff," then the jury may award punitive damages as well. Jury charge, trial transcript, page 2760.

■ In the case at bar, the jury found that the proof presented by the plaintiff met the clear and convincing standard and awarded both compensatory and punitive damages. The court finds that the award was well supported by the record and frankly, would have been astounded by a lesser result. The supporting evidence the court will hereinafter recount is but a representative sample of the evidence proffered of Home's misconduct. In preface to this discussion, the court notes

that William McDaniel and Jack Hall, Jr., counsel retained by Home to represent Carrier under the reservation of rights, were Home's agents as to knowledge and responsibility for wrongdoing. That is, breaches of duty on the part of these attorneys were attributable to Home in this context. Although retained by Home on behalf of Carrier, these attorneys were ethically bound to represent Carrier's and only Carrier's interests in the underlying litigation.

The first factor to examine is whether there was a full investigation of the underlying case. Intertwined with the investigation is the evaluation of the case. The question in regard to the evaluation is whether it was competent and honest.

The evidence showed that the investigation was tardy and slipshod in several important respects. Home began by assigning this multiple death and injury case to an inexperienced, low level claims adjuster who had a mere $25,000.00 in settlement authority. Her videotaped deposition which was admitted into evidence and played for the court and the jury clearly revealed how inadequate her experience and authority were for a case of this magnitude. Home was not aware of the existence of the videotape of the accident scene taken by a state trooper until the summer of 1990. Even with that information in hand, the tape was not reviewed by anyone at Home until November 27, 1990, less than a week before the cases were set for trial. This tape was put into evidence in the case at bar. The court and the jury watched this tape. It was grisly and graphic. Its use at the trial of the underlying cases would certainly have had a profound effect on the jury in the underlying cases. Analyzing the impact of such evidence in a fiery multiple death case is critically important to the evaluation of the case. The evidence further showed that the research on the applicable Alabama law on wrongful death, contributory negligence, and joint and several liability was tardily and at least somewhat poorly done. The history of verdicts in similar cases in the same jurisdiction is another important piece of the valuation process. The evidence showed that Home did not obtain this information until October 8, 1990, less than two

months before the trial. The evidence further showed that discussion of hiring an accident reconstructionist did not take place until September 1990. Without information such as this, Home could not make a full and fair evaluation of the potential exposure of its insured. None of these things were done until after the policy limits settlement demand was withdrawn. Home's investigation of the case was tardy and cavalier. The evaluation was unsound and incompetent.

■ The history of the underlying cases is marked by concealment and gambling with the welfare of the insured by Home. Steady communication was maintained between Home and the lawyers it had retained to represent Carrier Express—communications to which Carrier was generally not privy and upon which Home relied as legal advice given in Home's best interest, despite the fact that McDaniel and Hall were not Home's counsel. This conduct did not comport with the duties imposed in *L & S Roofing* by the Alabama Supreme Court in keeping with its admonition that "[b]oth the retained counsel and the insurer must understand that *only the insured is the client.*" *L & S Roofing Supply Company, Inc. v. St. Paul Fire and Marine Insurance Company,* 521 So.2d 1298, 1303 (Ala.1987) (emphasis added).

Home failed to meet its duty of keeping the insured apprised of all relevant facts and developments in the case. The evidence showed that Home did not even have a procedure in place to keep its insureds informed about developments regarding cases against them which were being defended under a reservation of rights.

In the course of the underlying litigation, several crucial pieces of correspondence were never sent by Home to Carrier. The first was a letter sent to Bastien on September 18, 1989, drafted by Hall and signed by both McDaniel and Hall. This letter clearly stated, "We are preparing our motion for summary judgment in an attempt to get out of this case, however, *we do not feel that we will be successful* because the record has testimony which indicates Ricky Nelson Daniels is an agent for Carrier Express and that Carrier Express may have been the carrier as well as broker, in connection with the load trans-

ported by Siegal Transfer." Plaintiff's exhibit 14 (emphasis added). A significant amount of deposition testimony highly detrimental to Carrier's position had been given. The letter gave a summary of the deposition testimony gathered to that date. Hall further stated, "The settlement value of these cases also exceeds the combined policy limits of the defendants. . . ." Plaintiff's exhibit 14. Hall went on to recommend a $500,000.00 reserve fund (Home had reinsured $500,000.00 of the policy amount). A copy of this letter was never sent to Carrier by Home or by McDaniel or Hall.

Despite Hall's recommendation, the undisputed evidence showed that Home maintained a reserve fund of $6,000.00 for the suits, a totally inadequate sum in light of the tremendous exposure Carrier faced. The reserve fund remained at this ludicrously low level despite Home's knowledge of the enormous potential liability Carrier was exposed to and despite Hall's recommendation to increase the reserve to almost one hundred times the amount Home had reserved. This act was a blatant breach of Home's duty to maintain appropriate reserves.

Carrier was also not apprised of the contents of a September 29, 1989, memorandum from Hall to McDaniel which was a synopsis of the underlying cases to that date and essentially gave McDaniel a shortened version of the September 18, 1989, letter. Hall stated that Ricky Nelson Daniels, the driver of the truck carrying the steel coils, was the cause of the accident, and that if Daniels was found to be Carrier's agent then Carrier's potential liability exposure was tremendous. Hall then estimated the settlement value of Carrier's portion of the cases at $500,000.00. The plaintiff's expert witness Professor Bowdre found the basis for this figure to be somewhat mystifying in light of Carrier's level of exposure. Trial transcript, page 1794. It was grossly out of proportion to the risk Carrier faced if the cases went to trial. It was totally inconsistent with Hall's statement in that memo regarding Carrier's tremendous potential exposure and contrary to his statement in his September 18, 1989, letter to Bastien that the settlement value of the cases exceeded the policy limits of the

defendants. Carrier was not apprised of any of these evaluations.

In addition to not sending many crucial written communications to Carrier, Home did not apprise Carrier of the occurrence or the content of the extensive telephone communications between McDaniel and Bastien which were documented in Bastien's handwritten file notes. Plaintiff's exhibit 139.

Cindy Bastien's handwritten file notes make it entirely clear that McDaniel was rendering legal advice to Home at the expense of Carrier. These notes established McDaniel's role as counsel to Home. His advice was consistent with protecting Home's interests at the expense of Carrier's interests. Plaintiff's exhibit 139.

McDaniel's confusion about his role was apparent from his testimony in the case at bar. Early in his testimony he stated, "I was employed by them [Home]." Trial transcript, page 2217. He next stated, "[M]y *first duty* would be to the insured that I am representing." Trial transcript, page 2230 (emphasis added). The error here is that his *only* duty was to the insured. He later again referred to his "first duty," but corrected himself to say "only duty." Trial transcript, pages 2266–267. When asked how he justified not telling Home to settle in the face of a demand by Carrier to do so, he replied, "No, my client was Home, who I was being paid, but my client was Carrier and I—that is not my job. I made my recommendation and that is all I did." Trial transcript, page 2267. In response to a query as to whether he represented Home in the underlying cases, he replied, "Obviously, I represented, I was paid by Home. *Obviously, I represented Home.* But I represented—my first duty was to Carrier. . . . And I carried it out from the very beginning." Trial transcript, pages 2267–268. Perhaps most telling of McDaniel's posture as Home's attorney is the objection he made to a request for production of documents propounded in the case at bar on June 24, 1991. McDaniel's response was: "The deponent [McDaniel] objects to producing the documents called for on the grounds that many of the documents called for are *documents protected by the attorney/client privilege, which existed between*

said *William J. McDaniel and Home Insurance Company....* There existed a tri-partite attorney/client relationship between William J. McDaniel, The Home Indemnity Company and Carrier Express, Inc." Plaintiff's exhibit 123 (emphasis added). Also see trial transcript, page 2328–329.

McDaniel further testified that he did not know until he was deposed for the case at bar that he was defending Carrier under a reservation of rights. Trial transcript, page 2268–269 and 2278. Knowledge of his professional posture in the case defined his duties to his client. As discussed above, certain duties attach when a case is being defended under a reservation of rights. *L & S Roofing Supply Company, Inc. v. St. Paul Fire and Marine Insurance Company,* 521 So.2d 1298, 1303 (Ala.1987). Regardless of whether McDaniel actually knew of the reservation-of-rights defense, he was charged with the attendant duties, since the evidence showed that a copy of the letter informing Carrier of the reservation-of-rights defense was sent to his firm and was part of his case file.

As stated by the Alabama Supreme Court in *L & S Roofing,* "In a reservation-of-rights defense, it is the insured who may pay any judgment or settlement. Therefore, it is the insured who must make the ultimate choice regarding settlement." *L & S Roofing Supply Company, Inc. v. St. Paul Fire and Marine Insurance Company,* 521 So.2d 1298, 1303 (Ala.1987). Home treated this decision as solely its own, placing its interests above those of its insured and heedlessly disregarding the position of financial peril in which the underlying cases placed its insured. While an insurance company is not bound to comply with every demand for tender by an insured, the insurer must act as a prudent insurer in like circumstances. Carrier made written demands for tender of policy limits on three separate occasions. Letter of June 25, 1990, plaintiff's exhibit 29; letter of July 25, 1990, plaintiff's exhibit 44; and letter of August 24, 1990, plaintiff's exhibit 51. On August 24, 1990, Carrier also sent a letter to McDaniel stating, "We are your client. The insurance company is not." The letter went on to

demand that McDaniel make clear to Home that he concurred with Carrier's demand for tender. A copy of Carrier's letter to Home of the same date was attached. Plaintiff's exhibit 51. McDaniel voiced no such concurrence. He, in fact, continued to recommend that Home postpone a decision on a tender of its limits until after the summary judgment ruling. As McDaniel knew, the $3,150,000.00 settlement offer was due to expire prior to this ruling, and expire it did. McDaniel did not tell Carrier, his only client in these suits, of this or of any of his several other recommendations to Home. Home continued to refuse to tender.

In the case at bar, all circumstances which bore on the welfare of the insured militated in favor of tender. See expert testimony of Karon Bowdre, trial transcript, pages 1842–843. The undisputed expert testimony from both of plaintiff's expert witnesses established that the prudent insurer would have tendered its limits in the summer of 1990. During its direct examination of its expert witnesses, Alan Windt and Professor Karon Bowdre, plaintiff's counsel used a list of factors to be considered in assessing a bad faith claim in a reservation-of-rights situation. This list contained twelve headings with subheadings and essentially included the eighteen factors the court later instructed the jury on. Both Windt and Bowdre opined that Home had in some manner breached them all.

Home's conduct was most imprudent and incompetent. It failed to tender in response to a policy limits settlement demand which declared on its face that all interest in such a settlement would evaporate once the summary judgment motions were heard. Home refused to tender despite its insured's demands to do so, despite having been told by Hall in his September 18, 1989, letter that they would not succeed on a motion for summary judgment, and despite Carrier's tremendous and virtually certain liability exposure. Plaintiff's exhibit 14, page 9. The best odds that had been expressed to Home were a thirty-three percent chance of success on summary judgment. This opinion was expressed to Cindy Bastien by McDaniel in a telephone conversation on August 30, 1990,

the day before the arguments were heard on those motions. Plaintiff's exhibit 139, August 30, 1990, entry. He had previously put the odds at between twenty-five and thirty-three percent. Plaintiff's exhibit 139, August 27, 1990, entry. In the face of this information, Home blatantly lied to Carrier in its letter of August 31, 1990, which stated: "As you well know, your defense counsel, McDaniel, Hall, Conerly and Lusk, made a determination some time ago that Carrier Express, Inc. was *likely entitled to be dismissed from this case by way of summary judgment.*" Plaintiff's exhibit 53 (emphasis added). Based on the one-third odds of success expressed to Home by McDaniel and in direct contravention of its insured's explicit written demands for tender, Home chose to gamble with its insured's money and future existence by refusing to tender. Home had at stake only $500,000.00, since it had reinsured half of its $1,000,000.00 policy limits. Carrier had at stake its continued financial existence. The risk disparity was enormous and obvious.

Clear and convincing evidence in this case established that Home made a dishonest, unsound, incompetent, subjective, self-serving decision in refusing to settle the underlying cases in the summer of 1990. Home recklessly gambled with the continued existence of its insured. Home was arbitrary and inflexible in its refusal to tender prior to the hearing on summary judgment. Home's bad faith conduct was clearly and convincingly established as wanton, oppressive, and malicious. The court shall not disturb the jury's verdict.

### Punitive Damages

The defendant contends in its motion that the punitive damages awarded are so excessive as to violate its constitutional rights. Defendant further contends that the standard of clear and convincing evidence was not met. Defendant's motion for judgment as a matter of law, paragraphs 15 and 16. As discussed at length above, the requisite standard of proof was amply met.

As to the appropriateness of the amount of punitive damages awarded, the

court is required to conduct a post-trial review which includes the consideration of several factors defined by a recent line of judicial decisions. *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *Green Oil Co. v. Hornsby,* 539 So.2d 218 (Ala.1989); *Hammond v. City of Gadsden,* 493 So.2d 1374 (Ala.1986). Under the applicable standards, the trial court may order a new trial or a remittitur "only where the record establishes that the award is excessive or inadequate as a matter of law, or where it is established and reflected in the record that the verdict is based upon bias, passion, corruption, or other improper motive. . . ." *Hammond v. City of Gadsden,* 493 So.2d 1374, 1379 (Ala.1986). The court is required to create a record of its considerations and findings on this issue. *Id.*

The factors to be considered were first enumerated in *Hammond v. City of Gadsden,* 493 So.2d 1374 (Ala.1986). They were elaborated upon and refined in *Green Oil Co. v. Hornsby,* 539 So.2d 218 (Ala.1989). The United States Supreme Court reviewed the constitutionality of Alabama's procedural and substantive safeguards regarding punitive damage awards and found that "[t]he application of these standards . . . imposes a sufficiently definite and meaningful constraint on the discretion of Alabama factfinders in awarding punitive damages." *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 22, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1, 22 (1991) (hereinafter referred to in text as *Haslip* ). At the time *Haslip* was decided, the applicable standard of proof that had to be met in order to allow an award of punitive damages was reasonably satisfied from the evidence or preponderance of the evidence. That standard has since been changed to one of clear and convincing evidence. Alabama Code § 6–11–20 (1975, as amended). The plaintiff in the case at bar was held to the standard of clear and convincing evidence.

Of the seven factors enumerated in *Green Oil* and approved in *Haslip,* five have applicability to the case at bar.[10] These factors include:

> tion of criminal sanctions on the defendant for its conduct and the existence of other civil awards

**10.** The two factors which the court finds not to be applicable to the case at bar are the imposi-

(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred;

(b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct;

(c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss;

(d) the 'financial position' of the defendant;

(e) all the costs of litigation; ...

*Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 21–22, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1, 22 (1991). These factors are not exclusive. As the Alabama Supreme Court stated: "Justice may well require consideration of other factors." *Hammond v. City of Gadsden,* 493 So.2d 1374, 1379 (Ala.1986). A major factor not included in the list as such in *Haslip* but which is central to the consideration of any punitive damage award is the desirability or need to discourage this defendant and others from similar conduct. This purpose is basic to the goal of the award of punitive damages and is embodied in the standard jury charge used in both the Alabama state system and the federal court system. Alabama Pattern Jury Instructions Civil, 2d edition (1993), Instruction 11.03; Pattern Jury Instructions—Civil Cases, U.S. Eleventh Circuit District Judges Association, Punitive Damages 8.1.

In the case at bar, the court allowed the parties to submit direct evidence by affidavit regarding the issues created by Home's posttrial motion. The court further held a hearing on the issues created by that motion and offered the parties the opportunity to cross examine the witnesses presented by affidavit. The parties declined to cross examine any of the witnesses, but they did take advantage of the opportunity to have exhibits admitted into evidence and to argue their respective positions to the court.

The court will now examine each of the factors defined in *Haslip* as well as the deterrence factor.

▮▮ (a) Whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.

The punitive damages awarded are roughly twice the compensatory damages awarded and almost exactly the amount of compensatory damages claimed. In light of the overwhelming evidence of Home's callous disregard for the welfare of its insured, the court finds that Home jeopardized the very financial existence of Carrier by its failure to settle the underlying suits in July 1990. As discussed above, Carrier's going concern value was estimated at $3,000,000.00. Had a verdict between $12,000,000.00 and $20,000,000.00 been rendered against all defendants (in keeping with the judicial valuations given in the settlement conference with Judges Nelson and Lynne), Carrier would, in all likelihood, not have been able to post a supersedeas bond pending the appeal.[11] Plaintiffs' counsel would have then been ethically bound to proceed to collect against Carrier while Bethlehem, which was financially able to post bond, proceeded with an appeal. Carrier would have been completely stripped of assets and destroyed as a viable business entity in the face of such collection proceedings.

As the result of Home's misconduct, Carrier ultimately paid $4,875,000.00 above its in-

---

against the defendant for the same conduct. No proof was adduced establishing the existence of either of these factors. The proof offered regarding other civil awards only dealt with other complaints filed. No evidence was adduced regarding the outcome of these complaints.

11. Given Carrier's net worth of under $5,000,000.00, it did not have the capacity to borrow even that amount. A huge multi-million dollar verdict would leave Carrier in a distress sale situation which would greatly diminish the proceeds it could realistically expect to reap from a sale of all its assets. Since ninety percent of its business was provided by Bethlehem, its sale value would be further diminished unless some contractual provision could be made assuring the continuation of that relationship between Bethlehem and the purchaser. Without such an agreement, Carrier would be virtually worthless.

sured amount to settle the underlying cases. The jury found that Carrier suffered actual damages in the amount of $2,463,959.60 (half of the compensatory damages claimed plus the additional attorneys' fees incurred in protecting Carrier's interests toward the conclusion of the underlying suits). Carrier was put at risk of total annihilation by Home's failure to settle in July 1990, and in fact was made to pay $4,875,000.00 above its insured limits. The punitive damage award is not disproportionately large in comparison to the potential and actual harm inflicted. It bears reasonable relationship to the actual harm done and to the harm which potentially could have occurred.

(b) The degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct.

The facets of this factor have been extensively discussed in the earlier section on bad faith. As discussed above, the evidence is overwhelming that Home breached its duty to Carrier in almost every conceivable manner; that Home's misconduct spanned the entire period of the underlying litigation; that Home consciously put Carrier at risk; and that Home actively concealed crucial information to which Carrier was entitled.[12] Home's misconduct was highly reprehensible.

■ (c) The profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss.

By its misconduct, Home sought to retain its million dollars and did, in fact, retain it for the five months that elapsed between the July 1990 settlement demand and the date the policy limits were ultimately paid in December 1990. Home thereby profited to the extent of the investment value of that million dollars for that five months. Using a conservative figure based on 1990 corporate bond yields, Home profited some $40,000.00 to $45,000.00 by its wrongful refusal to tender its limits in July 1990. In essence, this profit arose from Home's gambling with Carrier's

money and financial viability. Home cannot be allowed to retain such profits and must be dissuaded from ever again pursuing profits via this route.

(d) The "financial position" of the defendant.

■ The most recent financial statement available on Home is for the fiscal year ending December 31, 1992. This financial statement shows Home's net worth as $102,442,-957.00. Plaintiff's Exhibit 1, March 16, 1994, hearing on punitive damages portion of defendant's motion for judgment as a matter of law. The $4,812,500.00 punitive damage award, therefore, represents less than five percent of Home's net worth and will not create undue hardship or jeopardize Home's financial existence.

(e) All the costs of litigation.

■ At the time of submission of the motions now under consideration by the court, the plaintiff had expended some $632,-000.00 in legal fees and expenses related to this suit. Without doubt, this cause will be appealed by the defendant, and the plaintiff will incur significant additional legal fees and expenses. Additionally, the interest on the $4,000,000.00 in loans taken out by Carrier will continue to run for the life of the appeal. The combined impact of these expenses has adversely affected Carrier's cash flow and hampered expansion efforts and halted payment of dividends. The costs to Carrier created by Home's misconduct lend further support to the affirmance of the punitive damages award.

(f) Deterrence.

■ A significant societal interest exists in deterring the type of egregious conduct exhibited by Home. This sort of misconduct by insurers makes a farce of the concept of insurance. To reduce or strike down the punitive damages award in this case would give license to insurers to place their welfare above that of their insureds and to encourage collusion among insurers in multiple defendant litigation by removing the fear of significant consequences. To so hold would be to

12. Evidence of the existence and frequency of similar past conduct by Home in regard to other

insureds is sketchy at best, and the court finds it not to be of significance in its considerations.

open the door wide for insurance companies in multiple defendant lawsuits to conspire among themselves to scuttle such settlement efforts without fear of being held liable for the resulting excess verdicts. This, the court obviously shall not do. .

The punitive damages award in this case can in no way be deemed to be excessive as a matter of law.[13] It bears a reasonable relationship to the potential and actual harm and to the high degree of reprehensibility of the defendant's conduct. No expert testimony was proffered by the defendant to refute the extensive evidence of bad faith and ill motive presented by the plaintiff or to in any way justify Home's conduct. The plaintiff presented clear and convincing evidence of Home's bad faith and ill motive. No showing was made by the defendant that the verdict was based upon bias, passion, corruption, or other improper motive. The court shall not disturb the jury's verdict as to the punitive damages award.

*MOTION TO ALTER OR AMEND FINAL ORDER TO INCLUDE PREJUDGMENT INTEREST FILED BY CARRIER*

██ The court also has before it a motion filed by Carrier to alter or amend the final order to include prejudgment interest. Carrier seeks award of prejudgment interest from December 14, 1990, until entry of the order ruling on this motion for amended judgment. December 14, 1990, is the date on which Carrier paid the $4,875,000.00 to the plaintiffs in the underlying suits. Having considered this motion, the court finds that prejudgment interest is to be awarded. The plaintiff has suggested that for ease of computation the interest be computed on the sum of the compensatory damages awarded

($2,463,959.60) less the additional attorneys' fee sought ($26,459.60). The court finds this a reasonable approach. The court further finds that the prejudgment interest period should close on the date judgment was entered pursuant to the jury's verdict. Accordingly, prejudgment interest is to be computed at the statutory rate of six percent per annum on the sum of $2,437,500.00 from December 14, 1990, until January 31, 1994, the date of entry of the judgment on the jury verdict. Code of Alabama § 8–8–2.

The defendant contends that prejudgment interest in this case is not to be awarded, because the damages were not capable of being reduced to a sum certain or a liquidated amount prior to the verdict of the jury. The court finds this position erroneous. The compensatory damages sought in this case were the amount paid by Carrier pursuant to the settlement agreement in the underlying cases plus the additional attorneys' fees incurred in protecting its interests in those suits. This sum was a fixed and certain amount which was objectively and clearly ascertainable. This finding comports with the law of Alabama. *Hunt v. Ward*, 262 Ala. 379, 79 So.2d 20 (1955) (prejudgment interest allowed for loss of use of plaintiff's truck during repairs or for period between damage and replacement).

That a question of fact existed for the jury to decide regarding the amount, if any, to which Carrier was entitled does not extinguish the plaintiff's right to prejudgment interest. See *Lapeyrouse Grain Corp. v. Tallant*, 439 So.2d 105 (Ala.1983) (Prejudgment interest was awarded on compensatory damages awarded not on a contractual or otherwise fixed sum but on evidence of various market prices for grain between the date of the cause of action and the trial.); *Atlanta &*

---

**13.** The court notes that allowing a punitive award of roughly twice the compensatory award is in no way extreme or out of line with existing case law. The punitive award allowed to stand in *Haslip* was more than four times the compensatory award and more than 200 times the out-of-pocket expenses of the plaintiff who was awarded the largest recovery. *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). In *Northwestern Mutual Life Insurance Co. v. Sheridan*, 630 So.2d 384 (Ala.1993), the Supreme Court of Ala-

bama remitted the trial level punitive award of $24,927,248.00 by half and allowed a punitive award of $12,463,624.00 in a case with a compensatory award of $400,000.00. See also, *First Alabama Bank v. First State Insurance Company, Inc.*, 899 F.2d 1045 (11th Cir.1990) ($3,000,000.00 punitive damage award affirmed in fraud case on basis of a single fraudulent act of a far less extensive and reprehensible nature than the egregious, continuing wrongful conduct exhibited by Home and detailed herein).

*Birmingham Air Line Railway v. Brown,* 158 Ala. 607, 48 So. 73, 78 (1908) (Held: "[W]here the damages claimed are for property which has been destroyed or injured, which has an ascertainable money value, it is proper to instruct the jury to add, to the damage ascertained, interest from the date when the injury was done."). Here, no property valuation need be done. Carrier's damage was monetary, the sum of money it paid in settlement of the underlying cases (offset by half by the jury).[14] The law of Alabama allows the award of prejudgment interest for losses sounding in tort as well as in contract where the damages have an ascertainable money value. *Braswell v. Conagra, Inc.,* 936 F.2d 1169, 1177 (11th Cir.1991) (allowing prejudgment interest in a fraud case where "damages are a sum capable of being made certain"); *Mutual Savings Life Insurance Co. v. Osborne,* 247 Ala. 252, 23 So.2d 867 (1945) ("[T]his Court has adopted the view that in tort actions, such as for damages on account of injury sustained to property, a claim will bear interest if it has an ascertainable money value, and the amount of that value measures the extent of recovery."); Charles W. Gamble, Alabama Law of Damages §§ 8–1 through 8–8 (2nd ed. 1988).[15]

Further, to deny plaintiff's motion in the case at bar would unjustly enrich the defendant and grant the plaintiff less than full compensation for its losses. By defendant's wrongful conduct it has denied the plaintiff the use of its money since the payment of the settlement in the underlying suits. The plaintiff has been deprived of the use of its money due to defendant's conduct, and prejudgment interest must be awarded in order to restore plaintiff to the position in which it would have been but for defendant's wrongful conduct. See Joel A. Williams, *Prejudgment Interest: An Element of Damages Not to Be Overlooked,* 8 Cumberland Law Review 521 (1977). Accordingly, the court hereby grants Carrier's motion to amend the judgment to allow prejudgment interest.

An order in conformity with the terms of this memorandum opinion shall be entered contemporaneously herewith.

DONE and ORDERED.

---

**14.** Had Carrier recovered the entire $4,875,-000.00, there would be no question that prejudgment interest applied from the date the settlement was paid. In the case at bar, the jury found that half of the $4,875,000.00 was paid for Bethlehem's benefit and, therefore, could not be recovered by Carrier. That defendant prevailed as to half of the amount sought in no way negates Carrier's right to prejudgment interest on the amount awarded.

**15.** For a good discussion of prejudgment interest as an element of damages see Joel A. Williams, *Prejudgment Interest: An Element of Damages Not to Be Overlooked,* 8 Cumberland Law Review 521 (1977).